[Civ. No. 14268.   First Dist., Div. One.   Apr. 24, 1950.]

DOROTHY RICHARDSON, Respondent, v. N. PRIDMORE et al., Appellants.

Morris M. Grupp and Remington Low for Appellants.

Andrew J. Eyman and Bernard B. Glickfeld for Respondent.

PETERS, P. J.—Plaintiff, Dorothy Richardson, and her husband were tenants in an apartment owned by defendant Friedman and managed by defendant Pridmore. The defendants unlawfully evicted the plaintiff and her husband. Plaintiff then brought this action alleging three causes of action. The first is in tort for damages for the wilful and unlawful eviction of the plaintiff, who was then pregnant and shortly thereafter suffered a miscarriage; the second is for damage to plaintiff's clothing, while the third is for conversion of plaintiff's property. The jury returned verdicts for the plaintiff on all three causes of action, fixing the damages on the first at $7,250, on the second at $25, and on the third for $50. On the motion for a new trial the plaintiff consented to a reduction to a total of $4,825. From the judgment in that amount defendants appeal.

The evidence shows a deliberate and intentional eviction of the plaintiff by defendants. Plaintiff and her husband moved into the Lassen Apartments in San Francisco as month-to-month tenants of a single room in May or June of 1947. To secure even these unsatisfactory accommodations plaintiff and her husband were forced to pay the manager who preceded Pridmore a bonus of $30. Shortly after the plaintiffs moved in, Pridmore became manager. There were 78 apartments in the building. The plaintiff and her husband were desirous of securing more room, but when Pridmore was approached she demanded a substantial bonus. Plaintiff promised to give Pridmore $50 as a bonus, and, as a result, on July 2, 1947, was able to secure a larger apartment in the same building. The bonus was never paid. It is a reasonable inference from the evidence that the failure to pay this bonus was the motivating cause of Pridmore's subsequent actions.

On July 2, 1947, plaintiff paid the rent to Pridmore, and on August 2, 1947, paid the rent for the period expiring on September 2, 1947. The apartment and the furniture were not in good condition, and plaintiff and her husband, at their own expense, repainted the floors and walls, and plaintiff made

slip covers for the furniture and bought drapes for the living room and kitchen. Plaintiff received one key to the apartment from Pridmore. Plaintiff's brother arrived in San Francisco shortly after the apartment was rented and, because he was unable to find a place to stay, lived with plaintiff and her husband for some weeks, with the acquiescence of Pridmore.

In August of 1947, plaintiff was 19 years of age and was a little over two months pregnant. It was her first pregnancy. She was in excellent physical condition. She was a professional entertainer and was working week ends. Her husband was an oiler on construction rigs. He was desirous of securing a union card as an .operator, but was unable to do so in San Francisco. He secured an offer of a job at Tracy, which he accepted, where he could work as an operator and thus qualify for an operator's card. His intention was to stay in Tracy only long enough to get his card, and then to return to San Francisco. He had no intention of abandoning the San Francisco apartment.

On August 17, 1947, the plaintiff and her husband left for Tracy. They took with them the husband's work clothes, a few cooking utensils and a small table. They left in the apartment the balance of their belongings, including the slip covers, drapes, most of their dishes, and most of plaintiff's clothes, and some of her husband's. Pinned on the wall of the apartment they left a note to plaintiff's brother which read: ''Chuck—Bill and I got a place in Tracy. Will be back in three or four days. Don't say anything about our moving yet. Leave a note and tell us your address. Love, Dot and Bill.'' Plaintiff testified that the reason for the third sentence was that she did not want to have her brother have their mailing address changed to Tracy, and that her brother would have understood exactly what she meant. This note was removed by Pridmore from the apartment and kept by her. She failed to tell plaintiff's brother about the note, although she saw him several times in and about the apartment house.

As plaintiff's husband, assisted by his brother, were moving their things on August 17th in preparation for the trip to Tracy, they met Pridmore, who asked if they were moving out. Plaintiff's husband testified that he told the manager that they were not moving, but were simply going out of town for a few days. This was corroborated by his brother. Plaintiff and her husband then went to Tracy, where they moved into a motel, paying for their room on a day-by-day basis.

On August 29, 1947, plaintiff returned to San Francisco

to get some of her husband's clothes. She discovered that her key would not operate the lock on her apartment door. She rang the bell, and the door was opened by a woman. In her apartment plaintiff saw a man in bed, and a small child playing on the floor. She asked what these people were doing in her apartment, and the woman told her that she had rented the place, and not to argue with her about it but to go down and see the manager. Plaintiff thereupon went down to see Pridmore and asked her why she could not get into her apartment. Pridmore replied that she had been told by plaintiff that they were leaving. This was denied by plaintiff, who then asked Pridmore where her clothes and other belonging were. Pridmore replied that they were in the basement. Plaintiff thereupon left and went to her sister-in-law's home.

Pridmore denied that plaintiff had been at the apartment on August 29th, testifying that she first returned on the morning of the 30th. She claimed that she did not re-rent the apartment until September 2d, and did not have the lock changed until that date. She also testified that the man and woman in the apartment were there solely to clean the apartment. The brother of plaintiff testified that he went to the apartment on August 24th or 25th and that his key would not then work. There was evidence by a locksmith that the lock had been changed on August 18th or 19th, and further, that, after this action was filed, Pridmore asked for a receipt for the work and requested that the receipt be dated, falsely, as of September 2, 1947. These conflicts were for the jury.

After leaving the apartment house on August 29th, plaintiff visited her sister-in-law, who told her to see the district attorney. At that office she was advised to get an attorney, and did so. That night she returned to Tracy. The following day she returned from Tracy and again consulted a deputy at the district attorney's office. She was sent to a police precinct station where arrangements were made to have a police officer accompany her to the apartment. In his company plaintiff went to the apartment, and in his presence tried the key, but it would not work. The two went down to see Pridmore who told the officer: "Well, I want to get rid of those people; their clothes is down in the basement." Pridmore admitted that the rent was paid, but refused to permit plaintiff to go into the apartment. The three of them then went to the basemen where plaintiff's possessions were in an untidy heap on the storeroom floor. Some of the belongings had been placed in large cardboard cartons, but the clothes were on the floor.

The officer testified that Pridmore told plaintiff "to get her stuff and take it out of the house, she was in a hurry or something," and that he replied: "Just a minute; don't get so rough about this thing. . . . You can't get away with this kind of stuff; the girl has got her rent paid. You throw her out, lock her room, and then order her out of the house. That isn't the right thing to do." Pridmore would not let plaintiff use the freight elevator, so that plaintiff was required to carry her things through the basement, up a flight of stairs and to the street. She made about five trips carrying her various belongings. The officer called her a cab and plaintiff went to her sister-in-law's house. There she repacked her belongings and made arrangements to have the boxes sent to Tracy. They were so sent, and remained there in the express office unpacked, until they were returned to San Francisco in September. Plaintiff discovered that some of her clothing was missing, and that all of the rest of her clothes needed cleaning. After sending her goods to Tracy on the 30th, plaintiff returned to that city that night. During the next week she returned to San Francisco three times for the purpose of trying to find another San Francisco apartment. All the trips to and from Tracy were made by bus.

The record shows that on the night of August 29th, after plaintiff's experiences at the apartment that afternoon, she was very upset and cried; that on the night of the 30th she was also very upset, and did not feel well; that the next morning she began to get cramps and had some small discharge; that during the following week the cramps and discharge became worse; that on September 8th she consulted Dr. Longley in Tracy; that the doctor told her that a miscarriage was threatened, prescribed aspirin and advised absolute bed rest; that she went home and went to bed; that that night she had a miscarriage; that before this occurred plaintiff's husband tried to get Dr. Longley, but was unable to reach him; that two other doctors failed to answer their phones; that plaintiff was attended, during the ordeal, by the operator of the motel. Plaintiff also testified that she remained in bed from September 8, 1947, to September 13, 1947, when she again consulted Dr. Longley; that for about two months thereafter she continued to be upset and nervous; that about five months after the miscarriage she again became pregnant and had a normal delivery in September of 1948. Plaintiff and her husband returned to San Francisco on September 17th or 18th, 1947, after the husband had secured his operator's card.

In its pertinent parts plaintiff's testimony was corroborated by her husband, brother, brother-in-law, the motel operator, the police officer, and the locksmith.

Dr. Longley, in response to a hypothetical question embracing all of the essential facts, when asked if such facts would cause a miscarriage, replied "I think that it is possible, not impossible, and very probable." He also testified that the early months of pregnancy were a danger period and that patients were always advised during such months not to undergo "any undue strain or stress or heavy lifting or undue emotional excitement," and that an emotional disturbance or physical strain could cause a miscarriage. He admitted, on cross-examination, that he advised his patients against long trips, but he gave it as his opinion that the miscarriage was not caused by the bus rides.

Another doctor called as an expert testified that, in his opinion, the miscarriage described in the hypothetical question was caused by emotional excitement and anxiety, coupled with undue physical exertion. He also testified that an examination performed by him the day before the trial demonstrated that plaintiff was suffering from a frigidity caused by the unhappy memory of the miscarriage.

This statement of the facts demonstrates that plaintiff has proved a cause of action in tort against defendants, and has proved that, as a proximate result of that tort, she suffered not only mental anguish and pain, but physical injury as well. Defendants' main contentions are that the eviction was a breach of contract, and that plaintiff's damages must be so limited; that no recovery in tort can be had unless threats or abusive language are employed; that in any event the claimed injuries were not proximately caused by the acts of defendants. None of these contentions is sound.

While the wilful eviction of a tenant is a breach of contract, California is in accord with the general rule that one suffering mental anguish and pain or physical injury as a proximate result of an eviction may waive the breach of contract and sue in tort. (*Emden* v. *Vitz*, 88 Cal.App..2d 313 [198 P.2d 696]; *Sloane* v. *Southern Cal. Ry. Co.*, 111 Cal. 668 [44 P. 320, 32 L.R.A. 193]; *Goldman* v. *House*, 93 Cal.App.2d 572 [209 P.2d 639].) We do not have to decide in this case whether recovery could be had solely for mental anguish caused by words alone, because here the plaintiff also suffered physical

injury. The better and more modern rule is that, even where there is no physical injury, recovery may be had for mental anguish caused by intentional and outrageous conduct. (Restatement of Torts, § 312; Prosser on Torts, p. 54, § 11, et seq.; Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich.L.Rev. 874; Green, *"Fright" Cases*, 27 Ill.L. Rev. 761; Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv.L.Rev. 1033; see, also, the recent and well-written decision in *Bowden* v. *Spiegel, Inc.*, 96 Cal. App.2d 793 [216 P.2d 571].) In this case the defendants intentionally and unreasonably subjected plaintiff to severe mental stress and physical strain resulting in physical injury and mental suffering to plaintiff.

The facts in the instant case are somewhat similar to those in *Emden* v. *Vitz*, 88 Cal.App.2d 313 [198 P.2d 696]. In that case plaintiff was unlawfully locked out of her apartment. She complained to the manager who yelled and screamed at her. Her mental distress caused a glandular disturbance and pain and suffering. The appellate court approved a judgment for the plaintiff and the Supreme Court denied a hearing without a dissenting vote. After referring to many cases on the subject the court stated (p. 318) : "As these and other cases cited above amply illustrate, the nature of the wrongful conduct which induces physical harm through its effect on the mind and nervous system is generally immaterial. The determination whether or not given conduct is legally wrongful, of course, may involve factual distinctions of importance and substance . . .; but once the wrongful quality is established, it matters not whether that conduct consisted of acts alone, or of acts accompanied by words, or of mere spoken words alone, for the legal inquiry in each case is thenceforth confined to the well-established channels of proximate cause and damages."

While in the present case no threats or abusive language were employed, and no violence existed, that is not essential to the cause of action. An eviction may, nevertheless, be unlawful even though not accompanied with threats, violence or abusive language. Here the eviction was deliberate and intentional. The conduct of defendants was outrageous. They must be held responsible for the damages caused by their deliberate and intentional acts.

The contention that the damages were not proximately caused by defendants' acts warrants but scant consideration. Whether plaintiff acted reasonably in carrying out the pack-

ages and in taking the bus trips when she knew that she was pregnant were matters for the jury. Proximate cause is normally a question of fact for the jury. The jury could well have found that plaintiff's action in carrying out the boxes was reasonable under the circumstances, and that this act, plus the emotional strain caused by the unlawful eviction, proximately caused the miscarriage. The jury also properly determined that the bus trips did not constitute the proximate cause of the condition.

This is also an answer to defendants' contention that plaintiff was guilty of contributory negligence as a matter of law. In addition, this defense was not pleaded. Moreover, contributory negligence is no defense to an intentional tort. (*Goldman* v. *House,* 93 Cal.App.2d 572, 576 [209 P.2d 639] ; *Seeger* v. *Odell,* 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291] ; Prosser on Torts, § 52, at p. 402.)

Defendants also contend that plaintiff failed to support with evidence three of the allegations of her complaint. The allegation that because of the wilful, malicious and deliberate eviction, plaintiff suffered damages in an alleged sum, is amply supported by the evidence. That was the vital allegation. The allegation that plaintiff was left without shelter for several hours and forced to seek shelter many miles distant is an immaterial allegation. The allegation that Pridmore "compelled" plaintiff to remove her belongings is perhaps an overstatement of what was proved, although the police officer's testimony would indicate that pressure was exerted on plaintiff to remove her belongings. At any rate, whether plaintiff was "compelled" to remove her belongings, is immaterial as long as the finding of the jury that she acted reasonably in removing them is supported.

The other contentions of defendants are so insubstantial as not to require discussion.

The judgment is affirmed.

Bray, J., and Schottky, J. pro tem., concurred.