[L. A. No. 22158. In Bank. Jan. 29, 1952.]

STATE RUBBISH COLLECTORS ASSOCIATION (a Corporation), Appellant, v. JOHN W. SILIZNOFF, Respondent.

John C. Stevenson and Lionel Richman for Appellant.

Borah & Borah and Peter T. Rice for Respondent.

TRAYNOR, J.—On February 1, 1948, Peter Kobzeff signed a contract with the Acme Brewing Company to collect rubbish from the latter's brewery. Kobzeff had been in the rubbish business for several years and was able to secure the contract because Acme was dissatisfied with the service then being provided by another collector, one Abramoff. Although Kobzeff signed the contract, it was understood that the work should be done by John Siliznoff, Kobzeff's son-

in-law, whom Kobzeff wished to assist in establishing a rubbish collection business.

Both Kobzeff and Abramoff were members of the plaintiff State Rubbish Collectors Association, but Siliznoff was not. The by-laws of the association provided that one member should not take an account from another member without paying for it. Usual prices ranged from five to ten times the monthly rate paid by the customer, and disputes were referred to the board of directors for settlement. After Abramoff lost the Acme account he complained to the association, and Kobzeff was called upon to settle the matter. Kobzeff and Siliznoff took the position that the Acme account belonged to Siliznoff, and that he was under no obligation to pay for it. After attending several meetings of plaintiff's board of directors Siliznoff finally agreed, however, to pay Abramoff $1,850 for the Acme account and join the association. The agreement provided that he should pay $500 in 30 days and $75 per month thereafter until the whole sum agreed upon was paid. Payments were to be made through the association, and Siliznoff executed a series of promissory notes totaling $1,850. None of these notes was paid, and in 1949 plaintiff association brought this action to collect the notes then payable. Defendant cross-complained and asked that the notes be cancelled because of duress and want of consideration. In addition he sought general and exemplary damages because of assaults made by plaintiff and its agents to compel him to join the association and pay Abramoff for the Acme account. The jury returned a verdict against plaintiff and for defendant on the complaint and for defendant on his cross-complaint. It awarded him $1,250 general and special damages and $7,500 exemplary damages. The trial court denied a motion for a new trial on the condition that defendant consent to a reduction of the exemplary damages to $4,000. Defendant filed the required consent, and plaintiff has appealed from the judgment.

Plaintiff's primary contention is that the evidence is insufficient to support the judgment. Defendant testified that shortly after he secured the Acme account, the president of the association and its inspector, John Andikian, called on him and Kobzeff. They suggested that either a settlement be made with Abramoff or that the job be dropped, and requested Kobzeff and defendant to attend a meeting of the association. At this meeting defendant was told that the

association "ran all the rubbish from that office, all the rubbish hauling," and that if he did not pay for the job they would take it away from him. "'We would take it away, even if we had to haul for nothing' . . . [O]ne of them mentioned that I had better pay up, or else." Thereafter, on the day when defendant finally agreed to pay for the account, Andikian visited defendant at the Rainier Brewing Company, where he was collecting rubbish. Andikian told defendant that "'We will give you up till tonight to get down to the board meeting and make some kind of arrangements or agreements about the Acme Brewery, or otherwise we are going to beat you up.' . . . He says he either would hire somebody or do it himself. And I says, 'Well, what would they do to me?' He says, well, they would physically beat me up first, cut up the truck tires or burn the truck, or otherwise put me out of business completely. He said if I didn't appear at that meeting and make some kind of an agreement that they would do that, but he says up to then they would let me alone, but if I walked out of that meeting that night they would beat me up for sure." Defendant attended the meeting and protested that he owed nothing for the Acme account and in any event could not pay the amount demanded. He was again told by the president of the association that "that table right there [the board of directors] ran all the rubbish collecting in Los Angeles and if there was any routes to be gotten that they would get them and distribute them among their members. . . ." After two hours of further discussion defendant agreed to join the association and pay for the Acme account. He promised to return the next day and sign the necessary papers. He testified that the only reason "they let me go home, is that I promised that I would sign the notes the very next morning." The president "made me promise on my honor and everything else, and I was scared, and I knew I had to come back, so I believe he knew I was scared and that I would come back. That's the only reason they let me go home." Defendant also testified that because of the fright he suffered during his dispute with the association he became ill and vomited several times and had to remain away from work for a period of several days.

Plaintiff contends that the evidence does not establish an assault against defendant because the threats made all related to action that might take place in the future; that neither Andikian nor members of the board of directors

threatened immediate physical harm to defendant. (See *Lowry* v. *Standard Oil Co.*, 63 Cal.App.2d 1, 6-7 [146 P.2d 57]; Restatement, Torts, § 29.) ▆▆ We have concluded, however, that a cause of action is established when it is shown that one, in the absence of any privilege, intentionally subjects another to the mental suffering incident to serious threats to his physical well-being, whether or not the threats are made under such circumstances as to constitute a technical assault.

In the past it has frequently been stated that the interest in emotional and mental tranquillity is not one that the law will protect from invasion in its own right. (*Newman* v. *Smith*, 77 Cal. 22, 27 [18 P. 791]; *Easton* v. *United Trade School Contr. Co.*, 173 Cal. 199, 204 [159 P. 597, L.R.A. 1917A 394]; *Cook* v. *Maier*, 33 Cal.App.2d 581, 584 [92 P.2d 434]; see 52 Am.Jur., Torts, § 45, p. 388, and cases cited; Bohlen, *Right to Recover for Injury Resulting from Negligence Without Impact*, 41 Am.L.Reg., N.S., 141, 142-143.) As late as 1934 the Restatement of Torts took the position that "The interest in mental and emotional tranquillity and, therefore, in freedom from mental and emotional disturbance is not, as a thing in itself, regarded as of sufficient importance to require others to refrain from conduct intended or recognizably likely to cause such a disturbance." (Restatement, Torts, § 46, comment c.) The Restatement explained the rule allowing recovery for the mere apprehension of bodily harm in traditional assault cases as an historical anomaly (§ 24, comment c), and the rule allowing recovery for insulting conduct by an employee of a common carrier as justified by the necessity of securing for the public comfortable as well as safe service. (§ 48, comment c.)

The Restatement recognized, however, that in many cases mental distress could be·so intense that it could reasonably be foreseen that illness or other bodily harm might result. If the defendant intentionally subjected the plaintiff to such distress and bodily harm resulted, the defendant would be liable for negligently causing the plaintiff bodily harm. (Restatement, Torts, §§ 306, 312.) Under this theory the cause of action was not founded on a right to be free from intentional interference with mental tranquillity, but on the right to be free from negligent interference with physical well-being. A defendant who intentionally subjected another to mental distress without intending to cause bodily harm would nevertheless be liable for resulting bodily harm

if he should have foreseen that the mental distress might cause such harm.

The California cases have been in accord with the Restatement in allowing recovery where physical injury resulted from intentionally subjecting the plaintiff to serious mental distress. (*Emden* v. *Vitz*, 88 Cal.App.2d 313, 319 [198 P.2d 696]; *Bowden* v. *Spiegel, Inc.*, 96 Cal.App.2d 793, 794-795 [216 P.2d 571]; *Richardson* v. *Pridmore*, 97 Cal. App.2d 124, 129-130 [217 P.2d 113, 17 A.L.R.2d 929].)

The view has been forcefully advocated that the law should protect emotional and mental tranquillity as such against serious and intentional invasions (see Goodrich, *Emotional Disturbance as Legal Damages*, 20 Mich.L.Rev. 497, 508-513; Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv.L.Rev. 1033, 1064-1067; Wade, *Tort Liability for Abusive and Insulting Language*, 4 Vanderbilt L. Rev. 63, 81-82), and there is a growing body of case law supporting this position. (See, e.g., *Barnett* v. *Collection Service Co.*, 214 Iowa 1303, 1312 [242 N.W. 25]; *Richardson* v. *Pridmore*, 97 Cal.App.2d 124, 129-130 [217 P.2d 113, 17 A.L.R.2d 929]; Prosser, Torts, § 11, p. 54 et seq., and cases cited; 15 A.L.R.2d 108.) In recognition of this development the American Law Institute amended section 46 of the Restatement of Torts in 1947 to provide:

"One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it."

In explanation it stated that "The interest in freedom from severe emotional distress is regarded as of sufficient importance to require others to refrain from conduct intended to invade it. Such conduct is tortious. The injury suffered by the one whose interest is invaded is frequently far more serious to him than certain tortious invasions of the interest in bodily integrity and other legally protected interests. In the absence of a privilege, the actor's conduct has no social utility; indeed it is anti-social. No reason or policy requires such an actor to be protected from the liability which usually attaches to the wilful wrongdoer whose efforts are successful." (Restatement of the Law, 1948 Supplement, Torts, § 46, comment d.)

There are persuasive arguments and analogies that support the recognition of a right to be free from serious, intentional, and unprivileged invasions of mental and emo-

tional tranquillity. ■ . If a cause of action is otherwise established, it is settled that damages may be given for mental suffering naturally ensuing from the acts complained of (*Deevy* v. *Tassi*, 21 Cal.2d 109, 120 [130 P.2d 389] ; *Merrill* v. *Los Angeles Gas & Elec. Co.*, 158 Cal. 499, 513 [111 P. 534, 139 Am.St.Rep. 134, 31 L.R.A. N.S. 559]), and in the case of many torts, such as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages. (See *Deevy* v. *Tassi, supra*; Restatement, Torts, § 905, comment c.) In cases where mental suffering constitutes a major element of damages it is anomalous to deny recovery because the defendant's intentional misconduct fell short of producing some physical injury.

It may be contended that to allow recovery in the absence of physical injury will open the door to unfounded claims and a flood of litigation, and that the requirement that there be physical injury is necessary to insure that serious mental suffering actually occurred. The jury is ordinarily in a better position, however, to determine whether outrageous conduct results in mental distress than whether that distress in turn results in physical injury. From their own experience jurors are aware of the extent and character of the disagreeable emotions that may result from the defendant's conduct, but a difficult medical question is presented when it must be determined if emotional distress resulted in physical injury. (See Smith, *Relation of Emotions to Injury and Disease*, 30 Va.L.Rev. 193, 303-306.) Greater proof that mental suffering occurred is found in the defendant's conduct designed to bring it about than in physical injury that may or may not have resulted therefrom.

■ That administrative difficulties do not justify the denial of relief for serious invasions of mental and emotional tranquillity is demonstrated by the cases recognizing the right of privacy. Recognition of that right protects mental tranquillity from invasion by unwarranted and undesired publicity. (*Melvin* v. *Reid*, 112 Cal.App. 285, 289 [297 P. 91] ; Restatement, Torts, § 867, comments c and d.) As in the case of the protection of mental tranquillity from other forms of invasion, difficult problems in determining the kind and extent of invasions that are sufficiently serious to be actionable are presented. Also the public interest in the free dissemination of news must be considered. Nevertheless courts have concluded that the problems presented are

not so insuperable that they warrant the denial of relief altogether.

In the present case plaintiff caused defendant to suffer extreme fright. By intentionally producing such fright it endeavored to compel him either to give up the Acme account or pay for it, and it had no right or privilege to adopt such coercive methods in competing for business. In these circumstances liability is clear.

Plaintiff contends that the trial court erred in admitting evidence of threats made by Andikian and members of the board of directors in 1950 against other nonmembers of the association to compel them to relinquish accounts they had solicited from customers of members of the association. This evidence was admitted to show the methods adopted by the association to protect its members from competition by nonmembers. It was relevant and admissible for that purpose. (*Evans* v. *Gibson*, 220 Cal. 476, 482 [31 P.2d 389]; see *People* v. *Coefield*, 37 Cal.2d 865, 869 [237 P.2d 570]; 2 Wigmore on Evidence [3d ed.] §§ 304, 371, pp. 202, 300.)

Plaintiff contends that the trial court erred in excluding evidence that rubbish accounts, including the Acme account, constitute property rights and have definite property values in the rubbish collecting business. It contends that because it was not allowed to prove the value of rubbish accounts it could not prove that there was consideration for the notes signed by defendant. There would be merit in plaintiff's contention if defendant had given the notes in exchange for an assignment of the Acme contract or in connection with the purchase of a going business. He secured the account, however, not through Abramoff, but by soliciting it from Acme. He had a right to compete for this business in the open market and was under no obligation to pay Abramoff for it. (*Continental Car-Na-Var Corp.* v. *Moseley*, 24 Cal.2d 104, 110 [148 P.2d 9].) Accordingly, the trial court correctly concluded that evidence of its value was immaterial.

Plaintiff contends that the trial court erred in instructing the jury that no legal arbitration had taken place between the parties. It points out that the by-laws provide for arbitration between the members and contends that its dispute with defendant was arbitrated under these provisions. Defendant did not join the association, however, until after the dispute over the Acme account was purportedly settled, and there is no evidence that he agreed before that time to

340

submit the controversy to the association's board of directors for settlement. (See Code Civ. Proc., § 1280 et seq.)

■■ The trial court instructed the jury that "an unlawful intent by one to inflict injury upon the person of another is that intent to act which wilfully disregards the right of a person to live without being placed in fear of personal safety." Because specific instructions were not given covering all the elements of defendant's cause of action, plaintiff contends that this specific instruction on intent allowed the jury to return a verdict for defendant based on a finding of an unlawful intent alone. The instruction does not, however, so inform the jury, and had plaintiff desired more specific instructions on the law of the case, it should have requested them. (Code Civ. Proc., § 607a; *Hardy* v. *Schirmer*, [1]63 Cal. 272, 275 [124 P. 993]; *Perry* v. *City of San Diego*, 80 Cal.App.2d 166, 171-172 [181 P.2d 98].)

■ Plaintiff contends that counsel for defendant was guilty of prejudicial misconduct by making an inflammatory closing argument to the jury. No objections or assignments of misconduct were made at the trial, and the court was not asked to instruct the jury to disregard the challenged remarks. It is therefore too late to raise the point on appeal. (*Cope* v. *Davison*, 30 Cal.2d 193, 202 [180 P.2d 873, 171 A.L.R. 667]; *Aydlott* v. *Key System Transit Co.*, 104 Cal. App. 621, 628 [286 P. 456].)

■ Plaintiff contends that the judgment against it cannot stand because the jury exonerated its agent Andikian, who was the principal tort feasor. The jury did not exonerate Andikian, however; the verdict was merely silent as to him. There is nothing in the pleadings or the instructions that indicates that the failure to find with respect to Andikian was intended as a verdict in his favor, and the transcript of the proceedings on the motion for new trial indicates that it was an inadvertence on the part of the jury caused by the failure to provide it with a form for a verdict against him. Under these circumstances plaintiff cannot attack the judgment against it because of the failure of the jury to return a verdict against its agent. (*Brokaw* v. *Black-Foxe Military Institute*, 37 Cal.2d 274, 279-280 [231 P.2d 816], and cases cited.)

■ Plaintiff contends finally that the damages were excessive. The question of excessiveness is addressed primarily to the discretion of the trial court, and an award that stands approved by that court will not be disturbed on appeal un-

less it appears that the jury was influenced by passion or prejudice. (*Deevy* v. *Tassi*, 21 Cal.2d 109, 120-121 [130 P.2d 389].) ▮▮▮ With respect to the general damages the trial court concluded that the jury was not so influenced, and on the record before us we cannot say that it was. The excessiveness, if any, of the award of exemplary damages was cured by the trial court's reduction of those damages to $4,000. (See *Deevy* v. *Tassi, supra,* 21 Cal.2d 109, 121; *Finney* v. *Lockhart*, 35 Cal.2d 161, 164 [217 P.2d 19]; *Parrott* v. *Bank of America*, 97 Cal.App.2d 14, 25 [217 P.2d 89].)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.