[Civ. No. 46. Fifth Dist. Dec. 6, 1961.]

ANGEL VARGAS et al., Plaintiffs and Appellants, v. DOMENIQUE RUGGIERO, Defendant and Respondent.

T. N. Petersen for Plaintiffs and Appellants.

Willard B. Treadwell for Defendant and Respondent.

CONLEY, P. J.—This is an appeal from an order granting the motion of the defendant, Domenique Ruggiero, for a judgment notwithstanding the jury's verdict in favor of the plaintiff, Clara Vargas, and from the judgment for said defendant entered pursuant thereto.

The complaint filed by plaintiffs, Angel Vargas and Clara Vargas, husband and wife, against the defendants, Domenique Ruggiero and his alleged agent, Virgil Mocci, is in two counts; the first, a cause of action by Clara Vargas, sounding in tort for a miscarriage; the second, a cause of action by the husband for an accounting and an injunction preventing threatened eviction from his home property contrary to his alleged contractual rights. The defendant, Ruggiero, cross-complained to quiet title to the plaintiffs' home place and for sums claimed to be due him, which claims were denied in the answer to the cross-complaint. During the trial by jury it was agreed by counsel that the second cause of action and the issues raised by the cross-complaint be separately litigated before the court at a later date, and the case then proceeded on the tort claim alone.

The claim of Clara Vargas, as set forth in the complaint, is

that Virgil Mocci, agent of Domenique Ruggiero, at his direction,

". . . came to the residence of plaintiffs . . . and did carelessly and negligently, in a malicious, rude, violent, threatening and insolent manner, threaten, yell at, menace, intimidate, malign, forewarn, defy and maledict the plaintiff, CLARA VARGAS, who was then and there pregnant with child, by about two months, thereby greatly upsetting and disturbing her, . . ."

with the result that,

". . . she was rendered generally sick, and suffered and sustained shock, nausea, and a miscarriage. . . ."

The jury's verdict was as follows: "We, the jury in the above-entitled cause, find the defendants, Domenique Ruggiero and Virgil Mocci, his agent, liable for the miscarriage suffered by the plaintiff, Clara Vargas, and assess damages as follows: $8,000.00 General Damages. *Actual & Hospital* Medical expenses. Dated this 9 day of July 1959. A. R. Cocke, Foreman."

[■■] No objection was made by the court or by either counsel to the form of the verdict, and, in fact, the record indicates that it had been previously agreed upon by counsel. Obviously, the verdict as to "actual and hospital expenses" is a nullity, because it completely disregards the jury's duty to fix damages. (*Watson* v. *Damon*, 54 Cal. 278, 280; 48 Cal. Jur.2d, Trial, § 239, pp. 253-254; 89 C.J.S., Trial, § 497, p. 160.) However, this observation does not compel a conclusion that the form of the rest of the verdict is not sound; it awards $8,000 in general damages to plaintiff against both defendants.

The defendant, Ruggiero, through his counsel, immediately moved for a judgment notwithstanding the verdict, and the motion was granted; consequently, judgment was thereafter entered in his favor. The codefendant, Mocci's, similar motion for a judgment notwithstanding the verdict was denied; but his later motion for a new trial was granted, although this latter fact is irrelevant so far as this appeal is concerned.

The sole question to be determined here is whether the trial court erred in granting Ruggiero's motion for a judgment notwithstanding the verdict. The duty of the court in passing on such a motion is thus stated in *Reynolds* v. *Willson*, 51 Cal.2d 94, 99 [331 P.2d 48]:

"As noted, the jury returned a verdict in favor of the plaintiff and the only question to be determined on the appeal

is whether there is sufficient competent evidence in the record to support the verdict on any of the theories relied upon.

 ''The rules which govern the disposition of a motion for judgment notwithstanding the verdict, as in this case, are familiar. Such a motion may be granted only if a motion for a directed verdict should have been granted (Code Civ. Proc., § 629). The power of the court to direct a verdict is subject to the same limitations as its power to grant a nonsuit. (*Pellett* v. *Sonotone Corp.* (1945) 26 Cal.2d 705, 708 [160 P.2d 783, 160 A.L.R. 863].) A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; see also 24 Cal.Jur., p. 913, and cases cited.)

 ''In conformity with the foregoing rules the main if not the only problem presented is whether (disregarding all conflicting evidence favorable to the defendants), there is sufficient substantial evidence to support the verdict on any tenable theory of liability.'' (See also *Sparks* v. *Allen Northridge Market,* 176 Cal.App.2d 694 [1 Cal.Rptr. 595]; *Gonzales* v. *Derrington,* *(Cal.App.) 10 Cal.Rptr. 700; *Hozz* v. *Felder,* 167 Cal.App.2d 197 [334 P.2d 159]; *Kirk* v. *Los Angeles Ry. Corp.,* 26 Cal.2d 833 [161 P.2d 673, 167 A.L.R. 1]; *Jones* v. *Hotchkiss,* 147 Cal.App.2d 197 [305 P.2d 129].)

We deduce that the trial court based its ruling on the belief that there was inadequate proof of Mocci's agency, not only from the court's statement in the record, but because it contemporaneously denied Mocci's similar motion.

Was there sufficient evidence to support the jury's finding of agency? In reviewing the testimony the inquiry is necessarily limited to the question whether there is substantial evidence to support the verdict which was overridden by the trial court. For this purpose we must accept as true all evidence favoring the plaintiff and all legitimate inferences based thereon. The court is not concerned with conflicts in the evidence, or with whether a verdict adopting a contrary conclusion would have been upheld on appeal, or with

---

*A hearing was granted in the Supreme Court on March 29, 1961. The final opinion of that court is reported in 57 Cal.2d —— [14 Cal.Rptr. 1, 363 P.2d 1].

any question as to the credibility of witnesses, or the relative weight of conflicting evidence.

[■] In *Malloy* v. *Fong*, 37 Cal.2d 356, 372 [232 P.2d 241] it is said: "An agency relationship may be informally created. No particular words are necessary, nor need there be consideration. All that is required is conduct by each party manifesting acceptance of a relationship whereby one of them is to perform work for the other under the latter's direction. (See 1 Cal.Jur., Agency, 694, 696, §§ 5, 7; Rest., Agency, §§ 15, 16, 26, 34, 225.)"

■ As observed in *Brokaw* v. *Black-Foxe Military Institute*, 37 Cal.2d 274, 278 [231 P.2d 816]: "[T]he existence of agency is generally a question of fact, and 'whether he was such agent was an issue sharply contested at the trial, and was to be determined by the court upon a consideration of the entire evidence respecting the course pursued by him during the negotiations, rather than upon any specific testimony by him or by the defendant as to the fact of agency; and the inference which the trial court might reasonably make from such evidence is entitled to the same consideration as its finding of a fact upon contradictory evidence.' (*Willey* v. *Clements*, 146 Cal. 91, 96 [79 P. 850].) (See, also, *Ferroni* v. *Pacific Finance Corp.*, 21 Cal.2d 773 [135 P.2d 569]; 1 Cal. Jur., 696-7, 865.)"

[■] Agency is not dependent upon proof of compensation (*Flores* v. *Brown*, 39 Cal.2d 622, 628 [248 P.2d 922]; Rest., Agency, § 16, p. 85.) ■ It may be shown by the conduct of the parties and by action or inaction on the part of the principal. (*Buckley* v. *Silverberg*, 113 Cal. 673 [45 P. 804]; *Ford* v. *Lou Kum Shu*, 26 Cal.App. 203 [146 P. 199].)

■ In *Ferroni* v. *Pacific Finance Corp.*, *supra*, 21 Cal.2d 773, 779 [135 P.2d 569] the court says: ". . . evidence of a prior course of dealing between appellant and the partnership in similar transactions would be relevant on the question of an agent-principal relationship between them, . . ."

And that, "An implied agency relationship may arise from the words and conduct of the parties and the circumstances of the particular case."

In *Ellis* v. *Crawford*, 39 Cal. 523, 526, 527, a suit by plaintiff to recover money for work done on two schooners where agency was claimed, the court held: "[T]he jury were required to take into consideration all the facts and circumstances attending the construction of the schooners.". . .

"It being the province of the jury to find the capacity in which the defendant acted in the building of the schooners, and the evidence on this point being very conflicting, we cannot disturb the verdict as being contrary to the evidence."

In *Bergtholdt* v. *Porter Bros. Co.*, 114 Cal. 681, 688 [46 P. 738] the rules laid down in *Ellis* v. *Crawford, supra,* were followed: "Agency and the extent of the power of an agent are questions of fact [citation], and may be established by parol, except in those cases where a written authorization is expressly required by positive law. [Citation.] It may be established by circumstantial evidence."

The record shows that Domenique Ruggiero was a moneylender who resided in San Francisco and that Virgil Mocci, who had lived in Merced County since 1920, was widely acquainted there. He was involved in the institution and enforcement of numerous loans made by Ruggiero in Merced County. His activities included interviews with prospective borrowers, both in and out of the presence of Ruggiero, and of at least one trip to San Francisco for the purpose.

Mocci claimed that he never received compensation from Ruggiero for these multifarious activities, although he admitted that Ruggiero had loaned him money, at one time as much as $20,000. Mocci contended on the witness stand that friendship not only for Ruggiero but for all the borrowers was the sole motivating influence for these financial activities on his part; he testified:

"I do favor to the other party, if they come and don't know Mr. Ruggiero, they come to see me, and want some help, I like to help that party." . . . "They know Ruggiero is a friend of mine, they know Ruggiero got a lot of money and natural come to me to talk to Ruggiero, they never see Ruggiero to talk." . . . "And then I tell them, I say when Ruggiero is here, such a day you come over, and you can do business with Mr. Ruggiero." . . . "If they know me exactly, they come to see me if I help out, to talk to Ruggiero, to see if he let them have some money." . . . "They do business in my home, I am right there, . . ." ". . . natural you no let me go out, you want I be there to help you out, isn't it?" . . . "I took plenty of friends of mine to borrow money to Mr. Ruggiero." . . . "Anybody need the money, they want to see Mr. Ruggiero, then I take to Mr. Ruggiero and I don't take anybody else, nor to the bank, nor to any other places to do business, because the banks never do business with a lot of people, I guess you know that."

The witness, John Macias, testified that originally he had made a loan to Vargas, to purchase his ranch, and that Ruggiero and Mocci, with Vargas, came to see him to take over the loan; Ruggiero was to get 10 per cent interest and later 15 per cent; Mocci, Vargas, his nephew and the witness went to see Ruggiero in San Francisco, but he was not there; on the trip Mocci said:

" 'I can turn the deal over when we get there. You let me talk to him, and then everything will be all right.' "

The deal was finally made, and on the day in question Ruggiero and Mocci went in Ruggiero's automobile to the Vargas place. They arrived at about 11 o'clock in the morning on December 29, 1958, and the alleged tortious acts occurred while they awaited the return of Vargas; the two stayed in the yard until 3 or 3:30 p. m. In the conversation with Vargas, Ruggiero demanded "a new deal," involving more money; he said he had to have $1,379 by the first of the year and $100 per month thereafter; Vargas told him that it was impossible to meet these demands.

The jury thus had before it evidence of a long course of conduct indicating that Mocci was acting as local agent for Ruggiero; on the day in question Mocci stayed for many hours at the Vargas ranch to help enforce Ruggiero's demands; he was brought there by Ruggiero in the latter's automobile for that purpose; to Mrs. Vargas he said, ". . . they had come to talk about the ranch, one way or the other, they were going to fix that difficulty up one way or the other." Ruggiero was within seeing and hearing distance of Mocci most of the time, and he made no protest against his actions at the Vargas place.

We conclude from the entire testimony and the legitimate inferences deducible therefrom that there was ample evidence to justify the jury's finding of agency.

Although, as noted above, the trial court based its ruling on the belief that there was no substantial evidence of agency, we must examine the record further to ascertain whether the plaintiff failed in any other respect to make out a sufficient case to justify the verdict.

In California recovery has long been allowed for physical injuries, the genesis of which are emotional disturbances caused by fright and shock. As is said in *Taylor* v. *Pole*, 16 Cal.2d 668, 671 [107 P.2d 614]:

". . . definite disturbances of the nervous system caused

by mental shock, excitement, and so on, are classed as physical injuries and are recognized elements of damage. (*Dryden* v. *Continental Baking Co.*, 11 Cal.2d 33, 39 [77 P.2d 833]; *Sloane* v. *Southern Cal. Ry. Co.*, 111 Cal. 668 [44 P. 320, 32 L.R.A. 193]; 8 Cal.Jur., p. 772.)''

''The mental condition which superinduced the bodily harm in the foregoing cases was fright, but the character of the mental excitation by which the injury to the body is produced is immaterial. If it can be established that the bodily harm is the direct result of the condition, without any intervening cause, it must be held that the act which caused the condition set in motion the agencies by which the injury was produced, and is the proximate cause of such injury.'' (*Sloane* v. *Southern Cal. Ry. Co.*, *supra*, 111 Cal. 668, 683 [44 P. 320].)

''It is now well settled in this state that damages may be awarded for mental suffering caused by intentional and outrageous conduct.'' (*Guillory* v. *Godfrey*, 134 Cal. App.2d 628, 633 [286 P.2d 474].) (See also *Bowden* v. *Spiegel, Inc.*, 96 Cal.App.2d 793 [216 P.2d 571]; *State Rubbish etc. Assn.* v. *Siliznoff*, 38 Cal.2d 330 [240 P.2d 282]; *Emden* v. *Vitz*, 88 Cal.App.2d 313 [198 P.2d 696].)

The facts of this case bring it within the area of intentional and outrageous misconduct and the question that remains is proximate cause. Did the shouting of Mocci and the entering of the Vargas house without permission under the circumstances shown by the record constitute such conduct as to frighten Mrs. Vargas into an emotional state and shock which brought on the miscarriage? In *Richardson* v. *Pridmore*, 97 Cal.App.2d 124 [217 P.2d 113, 17 A.L.R.2d 929], the plaintiff was over two months pregnant. She and her husband had rented an apartment in San Francisco, but subsequently, they went to Tracy. Twelve days later plaintiff returned to the San Francisco apartment; the lock had been changed and her key would not admit her. The apartment was occupied by other tenants, and defendant had put her clothes in the basement. She returned to Tracy that night but went back to San Francisco the next day and, accompanied by a policeman, visited the apartment. One of the defendants refused to let plaintiff enter and told her ''to get her stuff and take it out of the house.'' Plaintiff had to carry her clothes from the basement up a flight of stairs to the street, and five trips were necessary in order to effect a complete removal of her property. She sent the belongings to Tracy and returned to Tracy

that night. During the next week she returned to San Francisco three times; all trips were made by bus. Plaintiff was emotionally upset and cried the first evening; the second night she did not feel well; on the morning following the second night she had cramps and a discharge which continued for several days, and about a week after the experience of being locked out of her apartment she miscarried. The court held that plaintiff proved a cause of action in tort; that the eviction was deliberate and intentional; and the conduct of defendants outrageous; that as a proximate result of that tort she suffered mental anguish and pain and physical injury; and that defendants should be held responsible in damages. The judgment for plaintiff was affirmed.

In this case, Mrs. Vargas testified that Mocci screamed from the outside of the house before she was aware that he had driven into the yard; before she reached the kitchen door he was inside the house; he "hollered" at her again after he entered her dwelling; and later shouted from outside and appeared to be very angry; the shouting greatly frightened her and made her nervous; Mocci emphatically told her that he and Ruggiero had ". . . come to talk about the ranch, one way or the other, they were going to fix that difficulty up one way or the other." ▆▆▆ After her husband arrived several hours later Mocci, Ruggiero and her husband argued loudly; shortly thereafter she had cramps in the lower part of her body; she was pregnant at that time.

The witness Dr. Hicks testified: "As to the probability of the patient being pregnant, she had been pregnant quite a number of times before. I would think that she would be probably as well qualified as any woman I have ever known. She has had more pregnancies than almost anyone you could find. Certainly she would be a personal authority as to whether or not she were pregnant or not. She would know the way that the people feel."

About seven hours later she began bleeding severely and miscarried; her pains had begun soon after Mocci and Ruggiero left; she fainted; her husband called the doctor, and she was taken to the hospital.

While there is a widely divergent view of medical opinion as to whether fright or emotional shock is a proven cause of miscarriage (Culiner, *Trauma and the Usual Miscarriage*, vol. 2, no. 2, Trauma, p. 54; Gray's Attorneys Textbook of Medicine, (3d ed.) vol. 2, § 58.02, p. 595; Wilson and Smith,

*Abortion as Related to Trauma,* (March 1959), vol. 2, no. 1, Clinical Obstetrics and Gynecology, p. 13; Eastman, Williams Obstetrics, (10th ed.) § 6, p. 482), judicial opinion is more prone to concede a causal relationship. (Prosser on Torts (2d ed.) p. 45; Prosser, *Intentional Infliction of Mental Suffering: A New Tort,* (March-June 1939), 37 Mich.L.Rev. 693; Green, *Fright Cases,* (1932) 27 Ill.L.Rev. 761, 873; Rest., Torts (1960 reprint 1934), vol. 2, § 306, p. 832, and § 312, pp. 847, 849.) In section 312 of the Restatement of Torts at page 847 it is said: "If the actor intentionally and unreasonably subjects another to emotional distress which he should recognize as likely to result in illness or other bodily harm, he is subject to liability to the other for an illness or other bodily harm of which the distress is a legal cause," and on page 849 this illustration is given: "A makes a violent and noisy attack upon B in the presence of his wife, C. C is pregnant, though showing no signs of being so. A's attack upon B so excites and disturbs C that she miscarries. A's attack upon B is negligent toward C."

In the *Richardson* case, *supra,* 97 Cal.App.2d 124, 129 [217 P.2d 113] it is said: "Dr. Longley, in response to a hypothetical question embracing all of the essential facts, when asked if such facts would cause a miscarriage, replied 'I think that it is possible, not impossible, and very probable.' He also testified that the early months of pregnancy were a danger period and that patients were always advised during such months not to undergo 'any undue strain or stress or heavy lifting or undue emotional excitement,' and that an emotional disturbance or physical strain could cause a miscarriage."

In the instant case the witness Dr. Hicks testified: " [T]here are several known causes of miscarriages. And secondly, there are quite a number of unknown causes of miscarriages." . . . "We do know that emotions have an effect upon the individual, individuals react differently to emotions, but we do know that stress and strain placed upon an individual causes many things." . . . "But I can say this, that it does follow that many, many of the girls who do unfortunately miscarry, are under a great emotional strain. Pregnancy to a lot of people is an emotional strain, pregnancy alone, but with added emotional pressure, it makes it even more so. Now as I say, a great many women miscarry for no known cause. However, a great many women who are placed under emotional stress and strain do miscarry, and I think a pro-

portionate number who have an added amount of stress and strain miscarry, that one cannot ignore this fact that there is some relationship.''

In *Emden* v. *Vitz, supra,* 88 Cal.App.2d 313, 318 [198 P.2d 696] the court states: ''[T]he nature of the wrongful conduct which induces physical harm through its effect on the mind and nervous system is generally immaterial.''

In *Bowden* v. *Spiegel, Inc., supra,* 96 Cal.App.2d 793, 795 [216 P.2d 571] the court said: ''The important elements are that the act is intentional, that it is unreasonable, and that the actor should recognize it as likely to result in illness.''

The evidence of plaintiff that Mocci intentionally entered her house without permission and shouted loudly and angrily; that he stayed on the premises for several hours under the circumstances disclosed by the record, with the result that she suffered emotional disturbance, pain and miscarriage, brings this case within the scope of the *Richardson* case, *supra,* 97 Cal.App.2d 124 [217 P.2d 113].

Section 3333 of the Civil Code sets up the measure of damages in a case of this kind; respondent complains that the general damages allowed by the jury are excessive; but it is clear that if the elements justifying recovery were proved, the jury rightfully allowed some amount of damages, and a trial court is not authorized to grant a motion for judgment notwithstanding the verdict on any such ground.

The motion for judgment notwithstanding the verdict was erroneously granted.

The judgment is reversed with directions to enter a judgment on the verdict in favor of Clara Vargas and against Domenique Ruggiero for $8,000 and costs.

Brown, J., and Stone, J., concurred.

A petition for a rehearing was denied January 2, 1962, and respondent's petition for a hearing by the Supreme Court was denied January 31, 1962.