[Civ. No. 21509.   Second Dist., Div. One.   Nov. 13, 1956.]

LOU NOVA, Respondent, v. VINCENT X. FLAHERTY
et al., Appellants.

Lawler, Felix & Hall, A. Laurence Mitchell and John M.
Hall for Appellants.

Vaughan, Brandlin & Baggott and Thomas G. Baggott
for Respondent.

FOURT, J.—The defendants Vincent X. Flaherty, sports
writer, and Hearst Publishing Company, are here appealing

from a judgment entered on a verdict in plaintiff's favor in the latter's action for libel. After a five-day trial the jury returned a verdict of $25,000 general damages against both defendants, $2,000 special damages, $500 punitive damages against defendant Flaherty and $7,500 against the Hearst Publishing Company.

On May 14, 1953, Joe Walcott fought "Rocky" Marciano at Chicago for the heavyweight boxing championship of the world. Walcott was knocked down and counted out in the first round.

On May 17, 1953, the Los Angeles Examiner published defendant Flaherty's account of the Marciano-Walcott fight which critically commented on Walcott's failure to get to his feet from a sitting position before the count of 10. Therein he also wrote the following concerning plaintiff Nova's fight with Joe Louis on September 29, 1941, 12 years previously:

"Less creditable were the cowardly appearances against Louis of Max Baer and Lou Nova. . . .

"Nova was like a frightened, screaming child at vaccination time. He didn't throw a punch, but got hit by only one and seemed happy about the whole defeat. They lugged his carcass and towed it in abject disgrace toward his corner. He smiled bravely in the safety of his dressing room, wiping out the manliness of every victory he had ever won."

Defendants' answer admitted the publication, but denied malice and pleaded "That the gist and sting of the words . . . were . . . true," and also that they "were . . . fair comment and criticism by a newspaper sports writer concerning a subject of interest to a large body of the public . . . voluntarily solicited when he . . . sought public acceptance as a professional entertainer."

Appellants contend that the jury was erroneously instructed. In an instruction given at the plaintiff's request, the jury was told: "You are instructed that the publication heretofore read to you is *libelous as a matter of law.*" (Emphasis added.)

The very next instruction given at the plaintiff's request set forth that—"Libel is . . . 'A *false* and unprivileged publication. . . .' " (Emphasis added.)

In other instructions the jury was told that, ". . . words published . . . in order to be libelous, must possess two characteristics: First, they must be untrue; . . ."; also that, ". . . since the publication is libelous as a matter of law,

. . .''; and, "From the publication of matter which is libelous as a matter of law. . . .''

It is apparent that the jury was told in essence that the words complained of were *false as a matter of law*. Further, they were told, in substance, that nothing can be a libel unless it is false. Appellants aptly put in their brief, "so to say that words are libel as a matter of law is the equivalent of saying that they are false as a matter of law."

The plaintiff in this case alleged that the "words and publication were, and are false," which allegations defendants denied, and further set up in an affirmative defense that the gist and sting of the words alleged to have been printed and published of and concerning the plaintiff were and are true. It at once becomes evident that the court took from the jury the right to determine whether the gist or sting of the publication was true. As said by the Texas Supreme Court, in *Caller Times Pub. Co.* v. *Chandler*, 134 Tex. 1 [130 S.W.2d 853, 855]: "The instruction of the trial court that certain of the published statements complained of were libelous was tantamount to an instruction that there was no evidence to establish the truth of such statements, as well as an instruction that libel had been established as a matter of law."

There was substantial evidence produced by the defendants of the truth of the words and that the performance by the plaintiff in his fight with Joe Louis was cravenous. Joe Louis himself testified that during the fight, "He [Nova] acted frightened . . . during the entire fight." "It seemed he was scared . . . during the entire fight"; that during the fight Nova "landed some light punches but . . . none that I felt at all . . ."; and that "it turned out to be one of the easiest fights of my career, because to me he seemed really frightened and he didn't want to throw a punch. . . ."

Gene Tunney, former world's heavyweight boxing champion, testified that he witnessed the Louis-Nova fight from a ringside seat; that Nova was "obviously without confidence"; that Nova had "a palid expression when he came into the ring"; that Louis "stalked him [Nova] from pillar to post . . . and there was no action whatever because he [Nova] kept backing away"; that "I would say that God knows he was timid and slightly cowardly for a man who was looking to win the Heavyweight Championship of the World"; that during the entire fight Nova did not land any punches; that "it was really a pathetic situation . . ."; "Nova not only gave the appearance of being frightened, he was frightened, . . . .

He started running from pillar to post, backing all over the place . . .''; that Nova ''was not boxing'' but was ''pursuing safety''; and that Nova ''had no more interest in giving a skillful exhibition of boxing than a deer has at the first crack of a rifle in the woods; he [Nova] wanted safety.''

Other instructions were given with reference to the affirmative defense of truth. However, at best such other instructions could only bring about a conflict. The point was material and it is now impossible to tell which instruction or instructions the jury adopted in reaching their verdict. In our opinion, the giving of the conflicting instructions was extremely prejudicial to the defendants.

Further, the jury was instructed that it might infer malice ''. . . from . . . the language of the publication. . . .'' Civil Code 48a, subdivision 2, as amended in 1945, sets forth, among other things, ''. . . actual malice shall not be inferred or presumed from the publication or broadcast.''

██ The jury was further instructed that: ''If you find that the defendants have failed to prove either of their affirmative defenses of truth or fair comment, then in that event since the publication is libelous as a matter of law, the law implies malice on the part of the defendants. This means that if you find the circumstances just stated to you to exist, then the defendants have the burden of proving a lack of malice on their part.'' The malice referred to throughout the instructions was ''actual malice'' defined in Civil Code, section 48a, subdivision 4(d), sometimes called malice in fact or express malice, and the jury was so told.

██ On the issue of exemplary damages, the law does not imply malice on the part of a defendant from any failure on his part to prove truth or fair comment. The court in *Davis* v. *Hearst*, 160 Cal. 143, 179 [116 P. 530], said, ''The truth is that malice in fact is never presumed, but is always to be proved, and the utmost limit of the law is reached when it is declared that by proof of the unprivileged character of a publication, libelous *per se*, the jury may infer the existence of this malice.'' ██ As to the issue of exemplary damages, the burden of proving malice was upon the plaintiff and could not shift to the defendants. (*Davis* v. *Hearst, supra*; *Ross* v. *Sweeters*, 119 Cal.App. 716, 724 [7 P.2d 334].) ██ For the court to instruct the jury that ''malice'' meant what the code now defines as ''actual malice,'' and then to instruct that malice might be implied was, in our opinion, prejudicial error to the defendants.

The defendants contend further, with considerable force and persuasion, that "In writing the words complained of defendant Flaherty not only drew from his own recollection of what he had observed at ringside at the Louis-Nova fight and what Povich, another Washington sports writer, had told defendant Flaherty he had observed in Nova's dressing room after the fight, but he also had in mind when writing the words complained of certain very stringent criticisms of Nova's conduct during his fight with Louis published in Eastern city newspapers by other sports columnists after such fight. . . . Although hearsay, they were properly admitted on the issue of malice, i.e., as matters which defendant Flaherty had in mind when writing the words complained of."

For example, Bill Corum, in the New York Journal American of September 30, 1941, had published: "Whatever Nova's destiny, it is not pugilism . . . the fight was pretty much a mistake from beginning to end, on account of it came so close to being no fight at all. . . . But we wouldn't be doing our job as a reporter if we didn't point out that the Californian's [Nova's] showing was so miserably bad as to be ridiculous . . . confidence had sifted out of him [Nova] before he entered the ring. . . . To be wholly truthful, I never have seen a fellow who was supposed to be a top-rank fighter, whose aim was so bad and whose judgment of distance was so poor. He threw punches at Louis which positively wound up traveling in a direction completely opposite from the one in which the alert and sharp title-holder [Louis] was going at the moment. . . . I tell you only the truth when I tell you that at times, he actually was punching out with both hands at the same time like an infuriated lady shopper at a bargain counter . . . Louis . . . made Lou [Nova] do practically as he willed. . . . The trouble, it seemed to me, was that Nova was practically frightened stiff. . . ."

Dave Egan, in the Boston Daily Record of October 1, 1941, had published: "A fraud of epic proportions was perpetrated on the American public the other night. . . . Nova, possessor of a cosmetic punch, an anemic stance, and several left feet, is the worst excuse for a fighter who has come stumbling along since Johnny Paycheck came out of Omaha to die of fright. He is a spectacular bum who licked, in his entire lifetime, a frayed carbon-copy of the old Max Baer, and nobody else. . . . Nova is so bad, so smelly, so much of a fakir that the Colonel . . . finally picked himself a winner. His [Nova's] challenge for the title—if such it may be called—

consisted of retreating in hot haste for the entire six rounds, and throwing up hasty barricades of frightened arms as he fled around the ring. His left jabs were always short by a few inches, his rights were always short by a few feet, and that was the tip-off that the humpty-dumpty heavyweight was afraid to step in there and throw a punch. He [Nova] looked and acted like a fugitive from the remnant counter. . . . Nova wore the harried look of a hunted man from the moment he entered the ring, and his punches combined all the more dynamic qualities of peach-fuzz, eiderdown, and custard pudding."

Dan Parker of the New York Mirror of October 1, 1941, had published: "For a fellow who talked such an intellectual fight Lou [Nova] gave a kindergarten performance. . . . If what he demonstrated against Louis was a cosmic punch, I'll take the Sissy's Special—a swift slap on the wrist. . . . All Lou [Nova] showed against the champion was timidity, two left feet, a disposition to go right hand crazy and an utter lack of appreciation for Referee Arthur Donovan's humane action in saving his life by stopping the fight. Save for that one minute of action in the sixth, the fight was such an utter stinker that for the first time since the Twentieth Century Club started filming championship bouts, it is going to scrap the movies. The opinion is that it would do boxing in general and the Twentieth Century Club in particular great harm to exhibit them. . . . For a fighter trying to win the title, Lou [Nova] was putting up a strange performance. He back-tracked in his clumsy way, wouldn't lead and was using his two hands as if the right didn't know what the left was doing. . . . As I was saying, what Lou [Nova] needs to discover is which foot is his right one and how to throw a left jab. But on second thought, why should he, when that Hindu Hokum yields him a purse of over $70,000?"

Austen Lake, in the Boston Evening American of October 1, 1941, had published: ". . . Because we pugilistic professors saw him [Louis] asphyxiate what Monday we had cautiously called 'destiny's darling' and Tuesday termed a 'class 2-B bum' who upset our pre-watch scholarship by failing to land a solid punch in six rounds. . . ."

Jimmy Powers, in the New York Daily News of October 1, 1941, had published: ". . . I got the impression that Hogi man [Nova] was frightened to death. . . . Louis looked like a boxing teacher in there with one of our sub-novice Golden Glovers."

Flaherty testified that he had read the articles above mentioned at or about the time they appeared, and he could have carried in his mind the thoughts expressed by other writers when he wrote the paragraphs now sued upon. The sentiments expressed could support Flaherty's good faith.

Appellants also contend that it was error to refuse to give certain instructions requested by the defendants, that the jury's award was excessive and that under the pleadings and proof any award of special damages was erroneous. From what we have heretofore stated, the cause must be reversed and therefore no useful purpose would be served in extending this opinion.

Judgment reversed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied December 10, 1956, and respondent's petition for a hearing by the Supreme Court was denied January 8, 1957. Carter, J., was of the opinion that the petition should be granted.