[Civ. No. 18909. Fourth Dist., Div. One. Oct. 6, 1980.]

M. J. LAGIES, Plaintiff and Appellant, v.
HELEN COPLEY et al., Defendants and Respondents.

COUNSEL

Lynde Selden II and Selden & Davis for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Robert G. Steiner, Steven G. Amundson, Gray, Cary, Ames & Frye, David E. Monahan, Marilyn L. Huff and Stephen T. Landuyt for Defendants and Respondents.

## OPINION

**STANIFORTH, J.**—Plaintiff M. J. Lagies' suit sought damages, charged Helen Copley with slander and Helen Copley, Fred Kinne, Leo Bowler and Copley Press, Inc., with conspiracy to inflict emotional distress. The trial court(s) sustained defendants' general demurrers without leave to amend. Lagies appeals the judgments of dismissal.

Lagies' original complaint contained two causes of action. The first cause contained two counts, charged Helen Copley as follows: The first count alleged Helen Copley—chairperson of the board of directors of Copley Press, Inc.—telephoned Lagies' supervisor at Copley Press, Inc., where Lagies was employed as an investigative reporter and told him Lagies was "rude to [Richard] Silberman" and she wanted him pulled off the news story concerning Silberman. The trial court (Tharp, J.) sustained the general demurrer without leave to amend this count upon a sound premise. The claim was barred by the statute of limitations. No appeal was taken from this order.[1] The second count (first cause of action) of the original complaint charged Helen Copley with slander in a statement made to Larry Remer, a journalist for the California Journal. Remer was writing an article concerning editorial policies of the San Diego newspapers owned by the Copley Press, Inc. In response to Remer's question concerning an article Lagies had written, Mrs. Copley stated Lagies was "wrong" on the "facts." Remer then published in the California Journal his analysis of the editorial policies of the Union-Tribune, quoting Helen Copley as follows: "'I knew that the story was wrong because I'd had dinner with Dick [Silberman] and the Governor the night before,' she says. 'The facts just simply weren't right. I wanted that reporter taken off that story. But the editors overreacted. They shut down the presses and made some changes.' Copley may have been right about the facts in this case...."

---

[1]Lagies has made four attempts to plead a cause of action. The court sustained the demurrer to the original second cause of action *with* leave to amend. The sequence of amendments and demurrers sustained, intervening between the original complaint and the pleadings here under scrutiny, are not relevant to disposition of the issues on appeal.

Lagies asserts Mrs. Copley's statement charged him with inaccurate reporting of the Silberman story, that he was so inept at his trade, he had to be pulled off the story. These statements, he asserts, were motivated by malice, ill will and hatred toward him by Helen Copley and intended to punish him for investigating her friend Silberman. He charges the statement has injured his reputation, cast doubt on his ability as a journalist.

The trial court (Tharp, J.) found (1) the words used were a statement of opinion, not fact, and as such not actionable, (2) from the face of the pleading, it appears the words used were privileged under Civil Code section 47, subdivision 3, and nonactionable absent a showing of malice, and (3) there were no facts of malice alleged to defeat the qualified privilege given by Civil Code section 47, subdivision 3, and thereupon sustained the demurrer to the second count, first cause of action, without leave to amend.

The second amended complaint (second cause of action)—here under scrutiny—charged Helen Copley, Fred Kinne, Leo Bowler and Copley Press, Inc., as follows: These individual defendants conspired—outside the scope of their duties to the corporate defendant—to commit certain wrongful acts, to inflict emotional distress on Lagies. Pursuant to that conspiracy, Lagies alleges: Defendants abused their positions of authority by their conduct. Their conspiracy to distress him included demotions, discriminatory treatment, denial of long-accepted avenues of advancement, defamation of his reputation to his coworkers, his sources, and to the public generally. The defendants have conspired to get appellant to quit, even as they tarnish his reputation and blackballed him, prevented his being hired by other newspapers, published his confidential sources thus destroying his credibility as an investigative reporter; defendants have virtually isolated appellant in his place of employment, rendering him a de facto pariah, and they have reduced his professional stature by refusing to print his stories, assigning him to more and more degrading tasks, and discriminately refusing to allow him television exposure.

Lagies charges these acts have caused him humiliation, mental anguish, "anxiety, emotional distress and alienation on the job" and "he has been injured in mind and body"; that they are motivated by Mrs. Copley's hatred arising from his "rudeness" toward, investigation of, her personal friend Richard Silberman.

The trial court (Butler, J.) could find no facts of "outrageous conduct," therefore insufficient facts to constitute a cause of action for intentional infliction of emotional distress. The court observed: "[T]he acts...amount to nothing more than the conduct of an employer-employee relationship....[D]o they outrage the conscience of the community[?]" The answer was no.

## CONTENTIONS

On appeal Lagies contends (1) Judge Tharp should have disqualified himself before hearing the demurrer to the original complaint; (2) Copley's "slander" was not privileged, but if so, malice was properly pleaded to overcome the conditional privilege of Civil Code section 47, subdivision 3, and (3) the trial court erred, applied the wrong law in sustaining the demurrer to the second amended complaint.

## DISCUSSION

### I

At the outset of the hearing on the demurrer to the original complaint, Judge Tharp stated: "Pardon me. Before we start I should mention that I am acquainted with the plaintiff. A few years ago, two or three, he did an article on traffic tickets, or something, and I had a conversation with him, a lengthy one, and gave him some materials. I don't know if that bothers anyone, but I should make it known to you that I am acquainted with him." Mr. Monahan, counsel for defendants, then stated: "It doesn't bother me, Your Honor. They are pretty dry issues of law here today to be determined as opposed to a determination that would involve anybody's credibility, for example, whichever side the Court—" [Judge Tharp:] "Fine."

Counsel for Lagies remained silent. The hearing then proceeded. At its conclusion, Judge Tharp sustained defendants' demurrer to both counts of the first cause of action without leave to amend. Four days later, Judge Tharp sustained the demurrer to the second cause of action with leave to amend.

Only after receiving notice of the fact of the adverse ruling did Lagies' counsel seek rehearing and a recusal by Judge Tharp.

■ Lagies' motion was not only untimely but was also without merit. The disqualification of a judge provided for in Code of Civil Procedure section 170, subdivision 5, must be asserted at the "earliest practicable opportunity" after learning of the grounds therefor, otherwise it is deemed waived. (*Develop-Amatic Engineering* v. *Republic Mortgage Co.* (1970) 12 Cal.App.3d 143, 150 [91 Cal.Rptr. 193]; *Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 386, 391 [139 P.2d 930].) Here Lagies could have urged such disqualification at the time the court made its comments. (*Muller* v. *Muller* (1965) 235 Cal.App. 2d 341, 347 [45 Cal.Rptr. 182]; *Oak Grove School Dist.* v. *City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 703 [32 Cal.Rptr. 288].) Plaintiff failed to do so. Accordingly, he waived any claimed grounds of disqualification since he could not gamble on a favorable ruling and then move for disqualification upon receiving an adverse order. (See *Keating* v. *Superior Court* (1955) 45 Cal.2d 440, 446-447 [289 P.2d 209]; *People* v. *Tappan* (1968) 266 Cal.App.2d 812, 817 [72 Cal.Rptr. 585].)

■ If we examine this contention for its substance, there appears to be nothing on this record which would indicate any basis whatsoever for Judge Tharp recusing himself other than friendship with Lagies and some kind of an informant relationship with the reporter at some earlier period. Any connection to slander-conspiracy charges made in the complaint before Judge Tharp is totally lacking. Judge Tharp's personal knowledge, if he had such personal knowledge about stories previously written by Lagies, does not in any way show that the judge had a personal bias or prejudice concerning any party or a personal knowledge of disputed evidentiary facts involved in these proceedings. Thus neither the law nor canons of ethics required Judge Tharp to disqualify himself.

## II

Lagies next asserts Copley's "slander" uttered to reporter Remer was an unprivileged statement of fact.

At the hearing on demurrer, Judge Tharp remarked what Helen Copley said "was not untrue. She expressed her opinion, her truthful opinion." The complaint alleges the statement made by Copley was untrue. ■ In this comment, the trial judge made a factual finding in excess of his authority, for he was ruling upon a general demurrer where he must accept all well-pleaded facts as true. This error, however, does not require reversal for California law allows recovery for a slander only for a false statement of *fact*. Statements of opinion are

not actionable. (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425].) ■ Whether a charged defamatory statement is a statement of fact or a statement of opinion is a question of law. (*Gregory, supra,* at p. 601; see also *Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 13-15 [26 L.Ed.2d 6, 14-15, 90 S.Ct. 1537, 1541-1542].) The question of what is opinion as distinguished from a false statement of fact is a difficult one. What constitutes a statement of fact in one context may be a statement of opinion in another in the light of the nature and content of the communication taken as a whole. (See *Emde* v. *San Joaquin County etc. Council* (1943) 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916].) Decisions have characterized alleged defamatory statements as fact or opinion upon a consideration of the particular circumstances in which the statements were made and with special attention to the probable expectancy of the audience to whom the statements were addressed. (See *Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 283-284 [112 Cal.Rptr. 609]; *Taylor* v. *Lewis* (1933) 132 Cal.App. 381, 385 [22 P.2d 569].) ■ Mrs. Copley's statement, "I knew the story was wrong because I'd had dinner with Dick [Silberman] and the Governor the night before. The facts just simply weren't right," clearly expresses her opinion as to the factual correctness of the story by Mr. Lagies. They express Mrs. Helen Copley's state of mind, her belief—and the source of that belief—that the story written by Mr. Lagies was not factually correct.

■ If it be assumed the words were a representation of fact and of a slanderous nature, then the face of the verified complaint disclosed a qualified privilege. Civil Code section 47, subdivision 3, provides: "A privileged publication or broadcast is one made—. . . 3. In a communication, without malice, to a person interested therein,. . .(3) who is requested by the person interested to give the information." Helen Copley's opinions and views were sought with respect to the "liberalized" editorial policies of the Copley Press, Inc. This certainly was, is, a matter of public interest to this community and the State of California as well as the questioner. Remer was writing an article for publication in a political news journal entitled *Helen Copley's liberation of the San Diego newspapers*. He requested information from her concerning the editorial treatment given a story on Silberman written by Lagies. A qualified privilege attached to the responses made by Helen Copley, absent any malice, when she responded, gave her opinion as to the correctness of Lagies' facts when the reporter inquired. As was stated in *Emde* v. *San Joaquin County etc. Council, supra,* 23 Cal.2d 146, 154:

"[G]reater protection is accorded one who makes a statement, in a reasonable manner and for a proper purpose, to persons having a common interest with him in the subject matter of the communication, when the publication is of a kind reasonably calculated to protect or further it." Thus the face of the complaint sets forth the privileged circumstances of the communication: Where the facts are clear and undisputed, the question of privilege is a matter of law for the court. (*Kramer* v. *Ferguson* (1964) 230 Cal.App.2d 237, 244 [41 Cal.Rptr. 61].)

Lagies urges that the precise question presented this court is whether Copley and Remer shared a "common interest" within the scope of section 47, subdivision 3. He argues they did not in that Copley's status as a newsmaker was a role that Remer cast for her—she was not being consulted by him in her capacity as Lagies' employer. Lagies raises this question: Does a reporter like Remer or the general public as third parties have a legitimate interest in the employee problems of the Union-Tribune? The answer to this question is an unqualified yes. The content of the article written by Remer was and is a matter of deep concern to the general public and to an investigative reporter like Remer. This question sought to disclose whether Mrs. Copley or Copley management was directing the editorial policy of the Union-Tribune newspaper in the fashion, that was reported, the newspapers had carried on during the lifetime of James Copley, Mrs. Copley's deceased husband. The charge had been made that during the lifetime of James Copley, and before taking over management by Helen Copley, there was a policy of suppression and distortion of news and of editorial silence towards certain political views and candidates. Remer's concern and inquiry of Helen Copley bore precisely on that point, to wit: whether the policy that had previously been in effect was still continued under the leadership of Helen Copley. The question concerning the handling of the writings of Lagies was directly in point on this issue and of most legitimate interest to Mrs. Copley, reporter Remer and to the newspaper reading public.

■ The question remains whether the complaint alleges facts of malice thereby defeating the qualified privilege. The trial court found that under the circumstances and the occasion of the remark there could be no factual basis for allegations of malice. It was said in *Biggins* v. *Hanson* (1967) 252 Cal.App.2d 16, 20 [59 Cal.Rptr. 897]: "If the occasion is conditionally privileged, if the defendant's primary motive is the advancement of the interest which the privilege protects and if he speaks in good faith, the mere fact that he harbors ill will toward

the plaintiff should be a neutral factor. [Citations.]" "[T]he court will look to the primary motive or purpose with which the defendant is inspired." (Prosser on Torts (3d ed. 1964) 821, 822.) Here the factual circumstances are clear and uncontradicted. Helen Copley's primary purpose was to respond to questions from a reporter writing a magazine article about her editorial policies. She did not seek out the opportunity to make the remark.

In *Everett* v. *California Teachers Assn.* (1962) 208 Cal.App.2d 291, 295 [25 Cal.Rptr. 120], the court said: "The above allegations appear to be nothing more than mere conclusions of the pleader *"unless the article itself lends support to such a conclusion.*" [Citations.]" Here an examination of the Remer article gives rise to no inference other than that the primary motivation of the response by Mrs. Copley was to explain her editorial policy. Malice in a defamation case means actual or express malice, hatred or ill will and not the fictional malice implied by law (see *Nova* v. *Flaherty* (1956) 145 Cal.App.2d 761, 764 [303 P.2d 382]). There must be an ill will beyond the normal feelings towards a wrongdoer. (*DeMott* v. *Amalgamated Meat Cutters* (1958) 157 Cal. App.2d 13, 26 [320 P.2d 50].) No factual allegations have been made nor none tendered which would meet the declared standard for malice. The conclusionary allegations of the complaint add no facts of requisite malice sufficient to defeat the privilege.

Civil Code section 47, subdivision 3, applies here. The trial court properly sustained the general demurrer without leave to amend as to both counts charging slander.

### III

■ Concerning the second amended complaint, defendants assert Lagies is relegated to the exclusive remedy of the Workers' Compensation Act by reason of his allegation of *bodily* injury. This contention overlooks the express requirement for exclusivity under Labor Code section 3601, to wit: that the employer or a fellow employee must be *acting* within the scope of his employment.[2] Lagies alleged the individual defendants "acted *outside* [italics added] the course and scope of their

---

[2]Labor Code section 3601 provides in pertinent part: "(a) Where the conditions of compensation exist, the right to recover such compensation, pursuant to the provisions of this division is, except as provided in Section 3706, the exclusive remedy for injury or death of an employee *against the employer or against any other employee of the employer acting within the scope of his employment,...*" (Italics added.)

agency relationship with the corporate defendant," that they "acted in furtherance of the conspiracy to their own individual advantages and interrogation [*sic*] of the rights of the Plaintiff" and that they participated in the conspiracy because of their feeling of "ill will and hatred toward plaintiff."

In each of the cases holding the exclusive remedy provisions of the Workers' Compensation Act a ban to an employee's civil action against the employer or fellow employees for an intentional infliction of emotional distress and physical disability, the plaintiff alleged the conduct of the employer or coemployee-defendant was within the scope and course of defendant's employment. (*Magliulo* v. *Superior Court* (1975) 47 Cal.App.3d 760 [121 Cal.Rptr. 621]; *Ankeny* v. *Lockheed Missiles & Space Co.* (1979) 88 Cal.App.3d 531 [151 Cal.Rptr. 828]; *Gates* v. *Trans Video Corp.* (1979) 93 Cal.App.3d 196 [155 Cal.Rptr. 486]; *Meyer* v. *Graphic Arts International Union* (1979) 88 Cal.App.3d 176 [151 Cal.Rptr. 597]. We conclude Lagies' pleading has avoided the exclusivity aspect of the Workers' Compensation Act.

Moreover, sound principles of law authorize a plaintiff/employee's civil suit for damages against his employer or coemployees, where either (1) his injuries are not compensable through workers' compensation (*Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833 [147 Cal. Rptr. 447]), or (2) where the injuries incurred were not incidents of the employment relationship. (Lab. Code, §§ 3203, 3208, 3600.) The latter rule is true even where the tortfeasor is the plaintiff's employer. (*Magliulo* v. *Superior Court, supra*, 47 Cal.App.3d 760. In short, Lagies is not precluded from his civil action by the mere existence of the employment relationship and the fact that his claim is against his employer and coemployees. Further, it has long been recognized a plaintiff could recover damages for emotional distress that was intentionally inflicted, even though the mental distress was unaccompanied by physical injury, where there was an "extreme and outrageous intentional invasion[] of [plaintiff's] mental and emotional tranquility." (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498 [86 Cal.Rptr. 88, 468 P.2d 216]; *State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 337-338 [240 P.2d 282].)

In the case at bench, Lagies has alleged intentional infliction of mental distress as well as accompanying physical disability resulting from a long series of intentional harassing, demeaning, improper, even tortious,

acts. ██ Defendants argue these allegations are insufficient as a matter of law to authorize damages.

A case closely paralleling Lagies' factual-legal posture is *Renteria v. County of Orange, supra*, 82 Cal.App.3d 833. Renteria alleged his employer-fellow employees treated him in a rude and degrading fashion, placed him under surveillance, questioned him at length and discriminated against him because of his Mexican-American descent "with the intent to cause him mental anguish." The appeal court (4th Dist., Div. 2, per Gardner, P. J.) held: "We conclude that an employee's cause of action for intentional infliction of emotional distress constitutes an implied exception to the exclusive remedy provisions of Labor Code section 3601." (*Id.*, at p. 842.) The reasoning of the *Renteria* court is most perceptive and persuasive when the court observed: "We have here not an isolated instance of a physical injury which is noncompensable, but an entire class of civil wrongs outside the contemplation of the workers' compensation system. [Citation.] Moreover, this class of civil wrongs involves intentional injury. Intentional wrongdoing in an employment setting has provided many difficult issues for resolution by the courts of this state, as illustrated by the *Conway-Azevedo-Magliulo* line of cases discussed above. [Citations.] The resulting decisions have evidenced continuing concern that the essentially 'no-fault' workers' compensation system would not provide a sufficient deterrent to intentional wrongdoing. In *Azevedo II* [*Azevedo v. Abel* (1968) 264 Cal. App.2d 451, 458 (70 Cal.Rptr. 710)], the court noted with satisfaction that the penalty provided by Labor Code section 4553 for an employer's serious and wilful misconduct was not subject to insurance coverage but must be paid from the employer's own pocket. [Citation.] However, the penalty takes the form of a 50 percent surcharge. Where there is no compensable injury, 50 percent of nothing is still nothing, and Labor Code section 4553 cannot function as a deterrent.

"While it is possible to believe that the Legislature intended that employees lose their right to compensation for certain forms of negligently or accidentally inflicted physical injuries in exchange for a system of workers' compensation featuring liability without fault, compulsory insurance, and prompt medical care, it is much more difficult to believe that the Legislature intended the employee to surrender all right to any form of compensation for mental suffering caused by extreme and outrageous misconduct by an employer. It would indeed be ironic if the Workers' Compensation Act, created to benefit employees, were to be

interpreted to shield the employer from all liability for such conduct. [Fn. omitted.] We decline to interpret it in this fashion." (*Ibid.*, p. 841.)

While the factual allegations of *Renteria* are not identical, yet on any intensity scale of "outrageous conduct" it cannot be said as a matter of law that the words and deeds of the employer in *Renteria* are compensable and those pleaded by Lagies are not.

These further authorities compel the same conclusion. In *Alcorn* v. *Anbro Engineering, Inc., supra*, the "outrageous conduct" consisted of racial epithets, arising from Alcorn's nonunion status, resulted in his discharge. And in *Golden* v. *Dungan* (1971) 20 Cal.App.3d 295 [97 Cal.Rptr. 577]; the outrageous conduct consisted of a process server knowingly and maliciously banging on a door at midnight. In *State Rubbish etc. Assn.* v. *Siliznoff, supra*, 38 Cal.2d 330, 334-335, there were threats of violence to compel payment for a rubbish account. In *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286], threats were made in bad faith to compel settlement of a nonexistent dispute. In *Richardson* v. *Pridmore* (1950) 97 Cal.App.2d 124, 130 [217 P.2d 113, 17 A.L.R.2d 929] the landlord changed a lock and removed clothes of an absent tenant.

The leading case of *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288 [131 Cal.Rptr. 547], involved threats to evict Newby from her apartment. The landlord called Newby a troublemaker, accused her of upsetting the other tenants, told her to vacate the apartment and gave her a three-day notice. The trial court granted a judgment of nonsuit as to the cause of action for intentional infliction of emotional distress. The appeal court reversed, held the issue of intentional infliction of emotional distress should have gone to the jury.

The *Newby* court summarized the applicable law: "Ordinarily mere insulting language, without more, does not constitute outrageous conduct. The Restatement view is that liability 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. . . . There is no occasion for the law to intervene . . . where some one's feelings are hurt.' (Rest.2d Torts, § 46, com. d.) Behavior may be considered outrageous if a defendant (1) *abuses a relation or position which gives him power to damage the plaintiff's interest*; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. (Prosser, Law of

Torts [4th ed. 1971 p. 54] at pp. 57-58;..." *Newby* v. *Alto Riviera Apartments, supra,* 60 Cal.App.3d 288, 297; italics added.)[3] The Supreme Court in *Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493, 498, footnote 2, emphasized the "status as employee" factor in the liability equation, stating: "The cases and commentators have emphasized the significance of the relationship between the parties in determining whether liability should be imposed. (See Prosser, Law of Torts [3d ed. 1964], ch. 2, § 11, p. 49; Harper and James, The Law of Torts [1956], § 9, pp. 666-667; Rest.2d Torts, § 46, com. e; Magruder, *Mental and Emotional Disturbances in the Law of Torts,* 49 Harv.L. Rev. 1033, 1051-1063; Prosser, *Insult and Outrage,* 44 Cal.L.Rev. 40, 47; Annot., 15 A.L.R.2d 108, 158-163.) *Thus, plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a stranger to defendants...*" (Italics added.)

The Supreme Court most recently in *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58], quoted with approval from *Newby* v. *Alto Riviera Apartments, supra,* recognizing that "'[l]ater decisions,...have allowed pleading and proof of less outrageous conduct.'"

Finally, the landmark case of *Molien* v. *Kaiser Foundation Hospital* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813], announced this broad principle: "'[T]here is a duty to refrain from the negligent infliction of serious mental distress'" (p. 928) and "the unqualified requirement of physical injury is no longer justifiable." (*Ibid.*)

The Supreme Court reasoned: "In our view the attempted distinction between physical and psychological injury merely clouds the issue. The essential question is one of proof; whether the plaintiff has suffered a serious and compensable injury should not turn on this artificial and often arbitrary classification scheme. We thus agree with the view of the *Rodrigues* [*Rodrigues* v. *State* (1970) 52 Hawaii 156, 283 (472

---

[3]The Restatement Second of Torts section 46, comment e, provides: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. Thus an attempt to extort money by a threat of arrest may make the actor liable even where the arrest, or the threat alone, would not do so. In particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position. Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous."

P.2d 509)] court: 'In cases other than where proof of mental distress is of a medically significant nature, [citations] the general standard of proof required to support a claim of mental distress is some guarantee of genuineness in the circumstances of the case. [Citation.]' (472 P.2d at p. 520.)....As Justice Traynor explained in this court's unanimous opinion in *State Rubbish etc. Assn.* v. *Siliznoff, supra,* 38 Cal.2d at page 338, *the jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience.* In addition, there will doubtless be circumstances in which the alleged emotional injury is susceptible of objective ascertainment by expert medical testimony. (See Comment, *Negligently Inflicted Mental Distress: The Case for an Independent Tort* (1971) 59 Geo.L.J. 1237, 1248 et seq.) To repeat: this is a matter of proof to be presented to the trier of fact. *The screening of claims on this basis at the pleading stage is a usurpation of the jury's function."* (*Molien* v. *Kaiser Foundation Hospital, supra,* 27 Cal.3d 916, 929-930; italics added.)

These sweeping rules and their rationale support a fortiori Lagies' right to present his claim to a jury and precludes our determination of these essentially factual issues as a matter of law.

Lagies has alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendants' conduct was extreme and outrageous, having a severe and traumatic effect upon plaintiff's emotional tranquility.

According to plaintiff's pleadings, defendants, standing in a position of authority over him, and for the purpose of causing him to suffer such distress, intentionally humiliated plaintiff, refused to print his stories, singled him out for denial of merit raises, demoted him, blackballed him, thus precluding other employment, published Lagies' confidential sources, thus destroying his credibility as capability for being an investigative reporter, all without just cause or provocation. Thus Lagies' pleadings charge more than mere insulting language, more than mere direction of job activities. Rather an abuse of the employer-employee relationship with the intent of damaging Lagies is the ultimate fact pleaded. These aggravated circumstances alleged by Lagies are sufficient to uphold his complaint as against defendant's general demurrer. "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liabil-

ity." (Rest.2d Torts, § 46, com. h; *Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493, 499.)

The judgment of dismissal of the first cause of action (counts one and two) is affirmed. The judgment of dismissal as to the second cause of action, second amended complaint, is reversed and the trial court is directed to overrule the demurrer and allow defendants to answer.

Brown (Gerald), P. J., and Hamrick, J.,* concurred.

A petition for a rehearing was denied October 9, 1980, and appellant's petition for a hearing by the Supreme Court was denied December 4, 1980. Bird, C. J., did not participate therein.

---

*Assigned by the Chairperson of the Judicial Council.