[Civ. No. 52368. Second Dist., Div. Five. May 18, 1979.]

HENRY GATES, Plaintiff and Respondent, v.
TRANS VIDEO CORPORATION et al., Defendants and Appellants.

COUNSEL

Bradford F. Ginder, Don Dewberry, Spray, Gould & Bowers and Douglas Stenzel for Defendants and Appellants.

Walter R. Larsen for Plaintiff and Respondent.

OPINION

STEPHENS, J.—Respondent Henry Gates brought an action against appellants Trans Video Corporation, his employer, and Merle Block, the general manager, on theories of intentional infliction of emotional distress and conversion arising out of two encounters between Gates and Block at the employer's premises in September 1974. Appellants appeal from the judgment entered upon the jury's verdict in favor of Gates in the amount of $40,000 on the intentional infliction of emotional distress cause of action and $25 on the cause of action for conversion.

Henry Gates began working for Santa Barbara Cable TV as a construction supervisor in 1963, which company was acquired by Trans Video Corporation, a subsidiary of Cox Broadcasting Co., in late 1971 or early 1972. On May 30, 1974, Gates injured his back while digging on a job site and eventually required hospitalization for a laminectomy in June and July of 1974. While convalescing, Gates received sick pay in an

amount that compensated him for the difference between workers' compensation disability payments and his regular salary. Although his employer's policy was that only a total of five days of sick pay was allowed, an exception was made and Gates continued to receive sick pay to augment his disability benefits until a total of an equivalent of sixteen full days of sick pay had been paid. In August of 1974, Gates learned from his employer that the sick pay benefits had been exhausted. Gates subsequently phoned Santa Barbara Cable TV and made an appointment with Block, the general manager, to talk about vacation and overtime pay he thought was owed to him.

On September 11, 1974, Gates went to his employer's premises during the regular office hours pursuant to his prior telephone conversation with Block. He presented a written list of demands to Block which concerned, in the first part, sick pay and what Gates apparently thought was an unfair double standard regarding corporate officers and salaried supervisors. However, no actual demand for a further extension of sick pay benefits was made. The second part consisted of a demand for payment of 15 days of vacation pay and for compensation for Saturdays worked from June 19, 1969, to June 19, 1972.[1] The total amount demanded was $2,804.40.

During the hour long conversation between Block and Gates, Block indicated that any such demands would have to be sent to the company headquarters and that this, considering a long-standing disaffection between Gates and one of the corporate officers, would probably result in his termination; at that point, Gates threatened legal action to enforce his rights. Towards the end of the discussion, tempers flared and Gates used derogatory words in reference to the company and Block heatedly told Gates to leave the premises.

However, rather than directly leaving the premises, Gates went into the bookkeeper's office to inquire about a check the company owed his son, who was also an employee. Apparently surprised to see Gates still on the premises and concerned regarding his announced intention to bring suit, Block told Gates in a loud voice that if he was going to sue the company

---

[1]The claim for back pay for Saturdays worked was based on a company policy before Santa Barbara Cable TV was acquired by Trans Video. The previous owner had an oral agreement among four technical supervisors, including Gates, that they would alternate working Saturdays with compensating time off the following Monday. Gates routinely worked his one Saturday a month, but did not take compensating time off. He tried unsuccessfully prior to Block becoming general manager to get extra vacation days for the compensating time he had not taken, but was refused the extra time off.

he was not allowed access to company personnel or records. He again told Gates to leave and instructed the bookkeeper not to give Gates any information.

Gates then started diagonally across the office, not in the direction of the exit and Block called after him asking him where he was going. Gates replied that he would not leave until he had a copy of his demands. A copy was made for him and Block escorted Gates to the front door, telling him not to set foot on the property again and to direct further communication through the company's attorney.

Although Gates apparently suffered no immediate ill effects from this encounter, at home an hour later he began trembling and had tears in his eyes. His wife called the doctor who had performed the back surgery and tranquilizers were prescribed.

On September 25th Gates received a letter dated September 24th informing him of his termination as of that date. The next day he received a phone call from Bill Kambarn, the person appointed to take Gates' place. Kambarn requested that Gates return the company's keys, tools and uniforms. Block called a few minutes later and repeated the request.

On September 27th Gates returned to Santa Barbara Cable TV with his son. After depositing the keys, tools and uniforms at the stockroom and while waiting for a receipt, Gates went to his old office to get his personal belongings from his desk. While he was looking in the desk and file cabinet, Block entered the office. Surprised to see Gates, he asked in a harsh, loud voice what Gates was doing and told him to leave. When told that Gates' attorney had told him he could get his personal effects, Block replied, "I don't give a damn about your attorney." Another employee testified that Block was close to yelling when he told Gates to remove his posterior from the premises.

Gates silently left the office, taking only his coffee cup, having been told by Block that the company would inventory the contents of the desk and return his property to him. However, rather than going towards his truck and the gate, he headed for the stockroom to pick up his receipt. Block shouted to Gates from a distance of about 20 feet asking where he was going and telling him to leave. Gates' son testified that Block shouted repeated "get outs." After picking up his receipt, Gates left without further incident.

After these incidents, Gates, his family and friends, testified that he was a changed man. He spoke daily of his termination and his health and friends visited less frequently. He had difficulty sleeping at night, the pain in his back, leg and chest got worse and he was constantly preoccupied with the incidents. His condition interfered with his sexual relations with his wife.

Gates was treated by a number of doctors for his physical and emotional complaints. He was rehospitalized for tests to determine if there was a physical cause for the continued pain, such as failure of the surgery. When these tests were negative, he was referred to a neurologist who hospitalized him at a pain control center in Bel Air. Finally, he was counseled by a psychologist for about two hours a day for fifteen days. Thereafter, he saw the neurologist about once a month during the year before trial.

On March 23, 1977, an order approving compromise and release for $40,000, minus permanent disability payments already paid, was executed by Charles F. Sorrow, referee for the Workers' Compensation Appeals Board for the injury sustained by respondent on May 30, 1974. Trial in superior court, which is the subject of the instant action, commenced on April 20, 1977. After a seven-day trial, the jury returned a verdict in favor of respondent for $40,000 for compensatory damages and $25 for conversion. No punitive damages were awarded. This appeal followed.

Appellants contend that the superior court lacked jurisdiction to grant judgment for intentional infliction of emotional distress because the injury was compensable under the workers' compensation statutes. Appellants assert that respondent's injury was sustained while he was acting in the scope of his employment and that, therefore, his exclusive remedy was compensation from workers' compensation, not damages in a civil suit. We will take these arguments one at a time in the order stated.

I.   *Were Respondent's Injuries Incurred While*
*He Was Still an Employee of Appellants for*
*Workers' Compensation Purposes?*

A great deal of case law in the workers' compensation area is devoted to interpreting when an injury is sustained within the course and scope of employment. In addition, subcategories have been developed, each with its own special set of rules and definitions. One such subcategory is the

situation where an employee is injured while either picking up his final paycheck, leaving the job site after being fired, or gathering up tools immediately after termination but prior to departure from the premises. (See *Argonaut Ins. Co. v.. Industrial Acc. Com.* (1963) 221 Cal.App.2d 140 [34 Cal.Rptr. 206]; *Peterson* v. *Moran* (1952) 111 Cal.App.2d 766 [245 P.2d 540]; and *Mauerhan* v. *Markowitz* (1921) 8 I.A.C. 261, respectively.) ■ We believe that the situation here falls within the category and that respondent was injured while still an employee for the purposes of workers' compensation.

■ That a person who has been discharged and sustains an injury while in the process of leaving the job site is still considered an employee for the purpose of compensation coverage stems from the provision of section 3202 of the Labor Code which requires that the provisions of the Workers' Compensation Act "be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." ■ We feel that we must heed this legislative mandate in this case, regardless of the fact that it is invoked by appellants in an effort to bar respondent's civil suit.

In a recent case, the First District was called upon to decide a case on facts which, while somewhat unique, are analogous to the facts of this case. In *Mitchell* v. *Hizer* (1977) 73 Cal.App.3d 499 [140 Cal.Rptr. 790], (following several days' absence) Robbins and Mitchell returned to the logging camp where they had been employed. They were returning to see if they could resume employment notwithstanding their absence, or, if not, to retrieve their tools left at the job site. As they drove into the logging camp, a tree that was being felled crushed their truck killing Robbins and injuring Mitchell. The court did not deem it important to determine whether they had actually been fired the day before the accident or on the morning it occurred when two other men were assigned to their positions. Rather, it said that "retrieving their property was both incident to and within the field of risk of the employment contract. We think the employment contract contemplated that they had a reasonable time after termination within which to secure the tools of trade which they provided and they were protected by the provisions of the Workers' Compensation Act when they were so doing." (*Mitchell* v. *Hizer, supra,* 73 Cal.App.3d at p. 507.) The court held, therefore, that workers' compensation was the exclusive remedy against the employers.

In this case, Gates went to his employer's office on September 11th by appointment. He was still on leave of absence and his purpose in going

there was to settle some matter regarding compensation he felt he was owed. To settle such matters has been held to be of mutual benefit to both the employer and the employee and within the contemplation of the employment contract. (*Pacific Indem. Co.* v. *Ind. Acc. Com.* (1945) 26 Cal.2d 509, 514 [159 P.2d 625].)

Respondent asserts that after leaving Block's office he proceeded to the bookkeeper's office in order to get his son's paycheck and therefore was on a personal errand. In *Robbins* v. *Yellow Cab Co.* (1948) 85 Cal.App.2d 811 [193 P.2d 956], both the husband and wife worked for the same employer. The wife's shift started at midnight, but at 3 p.m. in the afternoon she made a special trip to the employer's premises to pick up her and her husband's paychecks. The wife first picked up and cashed her paycheck at the employer's premises. Then, as her husband's paycheck was at a different location on the employer's premises, she proceeded to transverse the premises to obtain the check. While proceeding to pick up her husband's check, she slipped and fell and was injured. In *Robbins* the court held that the wife's civil suit for damages against the employer was not precluded by the exclusive remedy provision for industrial injuries pursuant to Labor Code section 3601. The court held that the injury was not one " 'arising out of and in the course of the employment' " (*Robbins, supra,* at p. 813, quoting Lab. Code, § 3600), as the wife was "attending to a strictly personal matter" which was not a "natural incident of [her] duties or a momentary interruption thereof." (*Robbins, supra,* at p. 813.)[2]

The facts here are decidedly different from *Robbins.* The occurrences while Gates was in the bookkeeper's office trying to pick up his son's check were a continuation of the incident in Block's office. The statements made by Block to Gates referred to the previous discussion between them, and, in particular, Gates' threatened lawsuit. Furthermore, the events immediately following Gates' departure from the bookkeeper's office, wherein Gates demanded a copy of the written demands that were the subject of his discussion with Block, demonstrates that the events were but a continuing "flow of events." As such the occurrences in the bookkeeper's office must be considered employment related and not a "strictly personal matter."

In regard to the incident of September 27, although respondent had undoubtedly been fired by that date, we deem it unimportant to decide whether his actual date of termination was September 11th as he claims,

---

[2]See *Busick* v. *Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 985, footnote 4 [104 Cal.Rptr. 42, 500 P.2d 1386].

or the 24th, as is contended by appellants, although the evidence points to the latter.[3] In either event, his return to the employer's premises to return keys, tools and uniforms at the employer's request was "directly connected with the employment relationship and, being incident thereto, the employee [is] entitled to the protection of workers' compensation until he had left the premises." (*Mitchell* v. *Hizer, supra,* 73 Cal.App.3d 499, 505.

II.  *The Exclusive Nature of the Workers' Compensation Remedy.*

Although we have decided that the injury suffered by Gates was inflicted while he was acting within the employment relationship, because the injury was the result of an intentional tort, not the negligence of the employer, our inquiry into the exclusiveness of respondent's remedy does not stop. The development of case law in the area of the remedies available to employees who are injured by the intentionally tortious conduct of their employers has had a checkered course. However, recently a case was decided in the First District which is directly applicable to this case, and which precludes an employee from maintaining a civil action against his employer for intentionally inflicted emotional distress when accompanied by physical disability. (*Ankeny* v. *Lockheed Missiles & Space Company* (1979) 88 Cal.App.3d 531 [151 Cal.Rptr. 828].) The reasoning in that case is clearly applicable here, and we hold, therefore, that the judgment for intentional infliction of emotional distress must be reversed, as respondent's sole remedy is workers' compensation.

To begin our analysis we refer to another recent case from the Fourth District. In *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833 [147 Cal.Rptr. 447], the court considered an appeal from a demurrer in favor of the employer on a complaint for intentional infliction of emotional distress. In that case, the employee claimed that he had been tormented and harassed by his employer and fellow employees. On the basis of these acts, the employee sought damages for intentional and negligent infliction of emotional distress, among other things. The defendants demurred on several grounds, but the trial court sustained the demurrer on the single ground that the Workers' Compensation Appeals Board had

---

[3]Although respondent contends in his brief that he was fired on the 11th and the letter of the 24th was only confirmation of that fact, in his answer to interrogatories propounded by appellants he listed his period of employment as ending September 24, 1974.

exclusive jurisdiction over the matter. The appellate court reversed on the basis that the plaintiff had not alleged the existence of a compensable injury under the Workers' Compensation Act, since he alleged mental suffering alone without consequent physical injuries or that any employment disability had resulted. The court said: "While it is possible to believe that the Legislature intended that employees lose their right to compensation for certain forms of negligently or accidentally inflicted physical injuries in exchange for a system of workers' compensation featuring liability without fault, compulsory insurance, and prompt medical care, it is much more difficult to believe that the Legislature intended the employee to surrender all right to any form of compensation for mental suffering caused by extreme and outrageous misconduct by an employer. It would indeed be ironic if the Workers' Compensation Act, created to benefit employees, were to be interpreted to shield the employer from all liability for such conduct. We decline to interpret it in this fashion." (*Id.*, p. 841. Fn. omitted.)

While there is a superficial similarity between this case and *Renteria,* the point upon which the opinion in that case pivots is absent in the instant appeal. In *Renteria* the employee did not allege that he had suffered any physical injuries or employment disability. On that basis, the court held that he should not be precluded from having any remedy against his employer. Since he *could not* seek to be compensated for his injury from workers' compensation, the court held that he *could* seek redress through a civil remedy. However, in this case, Gates did allege that he was unable to engage in gainful employment as a result of the tortious conduct of his employer. Therefore, the holding in *Renteria* is inapplicable to the present case.

The First District came to this same conclusion in *Ankeny* v. *Lockheed Missiles & Space Company, supra,* 88 Cal.App.3d 531. The court held that *Renteria* was not applicable to a case in which the employee alleged that he had suffered physical injury and disability. In *Ankeny,* the court also pointed out that because *Magliulo* v. *Superior Court* (1975) 47 Cal.App.3d 760 [121 Cal.Rptr. 621], dealt solely with an employer's act of physical aggression, it would also have no application to a case involving intentional infliction of emotional distress. (88 Cal.App.3d 531, 534.)[4] Similarly, the court noted that the California Supreme Court had allowed an employee to sue his employer for intentional infliction of emotional distress based upon the vituperative treatment of the employee by the

[4]*Meyer* v. *Graphic Arts International Union* (1979) 88 Cal.App.3d 176 [151 Cal.Rptr. 597] is likewise distinguishable.

field supervisor. (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 496 [86 Cal.Rptr. 88, 468 P.2d 216].) Here again, however, compensable physical injury was not involved. The court in *Ankeny* said, "[s]ince neither *Alcorn* nor *Renteria* involved compensable physical injury or disability, limiting the plaintiffs to workers' compensation would have shielded the employer from all liability. Obviously, in drafting the Workers' Compensation Act, the Legislature did not intend such a result. Therefore, the plaintiffs in *Alcorn* and *Renteria* were allowed to file civil suits." The court then went on to conclude, "[u]nlike the cases of *Alcorn* and *Renteria,* workers' compensation, in this instance does offer plaintiff a remedy." (*Id.,* at p. 536.) The court held that the exclusive remedy provisions of the Workers' Compensation Act "bar an employee's civil action against his employer and fellow employees for intentional infliction of emotional distress where physical illness and disability accompany the emotional distress." (*Id.,* at p. 533.)

We are compelled to hold likewise in this case. ■ A controlling principle of the Workers' Compensation Act is that the board has exclusive jurisdiction when the "conditions of compensation concur." (Lab. Code, § 3600.) ■ Since respondent alleged that he was physically injured and disabled as a result of appellants' acts, he suffered a compensable injury under the Workers' Compensation Act. Therefore, the conditions of compensation are met and he is barred from bringing a civil suit for damages.

Since we have held that respondent is barred from maintaining a civil suit for damages, his exclusive remedy being worker's compensation benefits, we need not address appellants' other contentions regarding the damage award predicated on the intentional infliction of emotional distress cause of action.

Finally, we address appellants' contention that the judgment for respondent on the conversion cause of action is not based upon sufficient evidence and that respondent's evaluation of the property he claimed was converted was a mere "guess." ■ In regard to the conversion claim itself, respondent need not have shown that there was a wrongful taking, but merely that the property was not produced upon his demand for it. (*Edwards* v. *Jenkins* (1932) 214 Cal. 713, 720 [7 P.2d 702]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Other Acts, § 366, p. 2622.) Further, " ' '[t]he owner of an article whether he is generally familiar with such values or not, ought certainly to be allowed to estimate its worth. . . .' ' " (*Chatterton* v. *Boone* (1947) 81 Cal.App.2d 943, 948 [185 P.2d 610],

quoting *Kirstein* v. *Bekins Van & Storage Co.* (1915) 27 Cal.App. 586, 589 [150 P. 999].) In addition, it is clear that "evidence of a single witness, if unimpeached and uncontradicted, will be sufficient in any case where corroboration is not required by statute. (C.C.P. 1844; *Cal. Evidence,* § 479.)" (Witkin, Cal. Criminal Procedure (1963) Appeal, § 683, p. 667.) ▇ Therefore, since the testimony of Gates as to the failure of appellants to return the property he testified was in his desk at the time of his leave of absence and as to its value was unimpeached and uncontradicted, the award of $25 by the jury was supported by substantial evidence and is affirmed.

Judgment affirmed in part and reversed in part.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied June 6, 1979, and respondent's petition for a hearing by the Supreme Court was denied August 1, 1979.