[No. D011393. Fourth Dist., Div. One. July 19, 1991.]

ROBERT J. HORN, Plaintiff and Respondent, v.
BRADCO INTERNATIONAL, LTD., Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

654

**COUNSEL**

Baker & McKenzie, Charles H. Dick, Jr., and Morten Vigilius for Defendant and Appellant.

Gray, Cary, Ames & Frye, Marcelle E. Mihaila and L. B. Chip Edleson for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—Appellant Bradco International, Ltd. (Bradco) appeals from a judgment entered on a jury verdict in favor of Robert J. Horn (Horn). The jury, finding Bradco had breached an implied employment contract with Horn by terminating him, awarded Horn $464,269 in damages for lost salary and benefits, both past and future, plus $55,000 for additional consequential damages. Finding also that Bradco had intentionally inflicted emotional distress on Horn, it awarded Horn $10,000 as compensatory damages and $200,000 as punitive damages. Additionally, it found Bradco had breached its statutory duties under Labor Code section 201 et seq. and awarded Horn $35,000 as compensation he had earned but had not received upon termination.

Bradco challenges only the first two elements of the judgment, essentially claiming no substantial evidence supports the finding that an implied contract existed or that emotional distress was intentionally inflicted upon Horn independent of the actions involved in the termination.[2] Our review of the

---

[2]Although Bradco's challenges to the judgment are characterized as attacks on the propriety of rulings by the trial court, they are at bottom claims that no substantial evidence supported the jury's verdict. For example, Bradco first contends "The trial court erred in ruling that there can be an implied agreement for future employment when the parties have negotiated but never agreed upon the amount of future compensation or terms of payment." However, Bradco does not point out where this "ruling" was made, and we have searched in vain for

record convinces us the former finding is supported by substantial evidence, but the latter finding is not.

I. *Factual Background*

█ The evidence, viewed in the light most favorable to the prevailing party (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]), reflects the following factual scenario:

A. *The Initial Contract*

Ron Brady, president of E. F. Brady Company, Inc. (known as Bradco after corporate reorganization), hired Horn as chief operating officer for Bradco commencing in October 1983. Because of the potential risks associated with accepting the position,[3] Horn insisted upon (and Bradco agreed to) an initial guaranteed term of two years, with guaranteed compensation of $200,000 per year together with benefits and prerequisites equivalent to those received by Vince Lombardo, the most highly compensated manager other than Brady himself.

The compensation plan under Horn's initial contract differed from the plan applicable to all other highly paid managers in at least two respects. First, while all of Horn's compensation was guaranteed, other managers participated in a bonus plan which provided only the *potential* for their earning a bonus of up to 100 percent of their guaranteed salary. Second, the other managers' bonus earnings were paid out under the so-called "40-30-30" plan, whereas Horn's earnings were not deferred beyond the fiscal year in which they were earned.[4]

---

such ruling. To the contrary, the court properly instructed the jury that a contract's terms must be mutually agreed upon and such agreement manifested to the other party. It further instructed there was evidence that compensation was to be agreed upon at a later date, explaining that a contract which reserves an essential element for later negotiation is unenforceable. Bradco does not challenge the propriety of these instructions. Instead, on appeal, it merely argues the evidence was insufficient to show mutual assent because of the alleged failure to agree on an essential element—compensation.

Similarly, Bradco contends "The trial court erred in ruling that a former employee can recover damages for intentionally inflicted emotional distress caused by the manner in which the employment had been terminated." No such ruling is found in the record. To the contrary, the trial court instructed on this issue (not challenged on appeal) that emotional distress damages were recoverable *if* caused by conduct *"independent of plaintiff's termination"* (italics added). Bradco argues on appeal there was insufficient evidence to support a claim of actionable conduct independent of Horn's termination.

[3]Horn had various concerns about accepting a high-level position with Bradco. First, it entailed leaving Phoenix (and his newly begun business) and uprooting his family to move to San Diego. More importantly, Horn had concerns about "fitting in" at Bradco because it was a family business, it stressed long-term employment, and its senior managers over whom he would be placed had "grown up" with Ron Brady, possibly making them resistant to supervision by an outsider such as Horn.

[4]Under the "40-30-30" plan, portions of the bonus would be deferred, with 40 percent paid out in the following year, 30 percent paid in the next year following, and 30 percent paid in

Although the initial contract only provided for a two-year term, Horn viewed the job as a serious career move and the two-year contract as "just an initial term." Indeed, Horn spoke at length with Brady about the attractiveness of the Bradco milieu of long-term employment relationships, and Brady was proud of having so many long-term employees. They agreed that six months before the end of the initial term, i.e., March 1985, they would discuss Horn's continued employment beyond the initial two years.

### B. *Horn's Performance*

The parties' trial evidence was markedly divergent in its portrayal of Horn's performance during the initial two-year term. Brady painted Horn as a deceptive, misleading person concerned only with self-aggrandizement. He stated Horn's "me-first" attitude violated the team ethic of Bradco. His contribution, performance and attitude were questioned by other Bradco managers. Brady claimed some of these alleged problems surfaced early in the relationship and Horn remained a constant irritant and source of problems during his tenure with Bradco.

In contrast, Horn testified to the glowing praise he received from Brady concerning Horn's integration into Bradco and his contributions to the company. He produced documentary corroboration of such testimony. Supporting Horn's position was the fact that Bradco's income during Horn's tenure jumped from $29 million to $64.5 million, with company equity increasing from $4.9 million to $7.5 million. Brady told Horn that these figures were "outstanding." Moreover, Brady and Horn developed a close friendship over this period, which extended into their personal lives—the Horns viewing the Bradys as their best friends in San Diego.

### C. *Renewal of the Contract*

In the spring of 1985, Horn initiated discussions with Brady concerning his future employment with Bradco, as the two-year term was set to expire on September 30, 1985. Horn testified that during the discussions between him and Brady over the following months they agreed to renew his contract based on its original terms.[5] Although there were some ongoing negotiations

---

the next final year. Although Brady wanted Horn to participate in that plan (and in fact testified Horn's initial contract required him to participate therein, at least as to the last 18 months of his contract), Horn did not agree to such deferral, and no part of his compensation under the initial contract was ever deferred.

[5]Once again, Bradco's trial evidence painted a starkly different picture. Brady denied any agreement to renew Horn for an additional two years. He claimed to the contrary that because he had become so disenchanted with Horn's performance by the fall of 1985 (i.e., the end of

concerning restructuring of the compensation pay-out plan, Horn had no doubts they had agreed the next two years and beyond would continue along the same lines as originally agreed. Horn's wife confirmed that during the summer of 1985, Brady had spoken to her of Horn's future with the company, indicating that despite Horn's being a "tough one" on compensation, everything was resolved on the employment arrangement. Horn's wife also testified Brady had talked about Horn and Brady retiring together.

During the last six months of Horn's employment, he continued to receive praise for his performance, and there was evidence Bradco anticipated Horn would remain with the company for many years.[6] Horn denied ever being told he was "on probation." His actions during this period did not appear to be those of a person aware of his tenuous job security. To the contrary, Horn hired Brady's son-in-law to perform an extensive, $50,000 to $60,000 remodeling job on Horn's house (finished in Jan. 1986); Horn made no efforts at job hunting (and, indeed, referred others to job openings of which he was aware); and during the alleged probationary period he planned and paid for a Hawaiian vacation scheduled for early March 1986.

### D. *Termination*

On March 3, 1986, Brady handed Horn a note terminating Horn's employment. Horn was shocked, as he had never before suspected his job was in jeopardy. The note indicated Bradco would accept Horn's resignation effective as of April 1, 1986, and indicated he was being terminated because his values had not adjusted to those of Bradco and he had not adapted to Bradco's culture. When Horn asked Brady why he was being fired, Brady used Horn's response to the so-called "Ultrawall problem" as an example of inappropriate conduct.[7] Following further discussions concerning the char-

---

the original two-year contract), he told Horn he was on probation and had only an additional six months to improve his performance.

[6]Despite Brady's claim that he was dissatisfied with Horn and had placed him on "probation" for the last six months, Horn's monthly "draw" on his compensation was *increased* during this period from $2,200 to $2,500 per week; Horn was still included in confidential meetings and correspondence; and Brady changed the reporting responsibilities by having all of Bradco's profit center managers report directly to Horn. Horn testified that during the last six months he continued to receive praise from Brady for his contributions, and produced a note from Brady (written in late Dec. 1985) thanking Horn for a "great year," wishing Horn a happy 1986, and stating "I believe in us as I believe in me." Horn also produced a Brady memo, generated during the summer of 1985 as an outline for a three-year training program for Brady's nephew, in which Brady contemplated his nephew would spend the third year training with ". . . just Managers, including me, Bob Horn, etc., . . ." evincing some indication Brady expected Horn to remain with Bradco into the foreseeable future.

[7]The "Ultrawall problem," a subject of much testimony at trial as being part of Horn's attempt to prove a tort cause of action for wrongful termination in violation of public policy,

acterization of Horn's termination (the details of which we reserve for discussion in our analysis, *infra,* at part IV) Horn left Bradco's employ after April 1.

### E. *The Lawsuit*

Horn's lawsuit pleaded claims for breach of contract, breach of implied contract, wrongful discharge, breach of the duty of good faith and fair dealing, wrongful denial of contract, fraud, breach of statutory duties, interference with prospective advantage, and infliction of emotional distress. Trial was conducted as to all claims except the interference with prospective advantage claim (settled pretrial) and the breach of the duty of good faith and fair dealing claim (abandoned by Horn prior to trial). The jury, by special verdict, found that Bradco breached an implied contract with Horn when it terminated him without good cause; that Bradco had intentionally inflicted emotional distress on Horn; and that Bradco owed Horn $35,000 of compensation at the time he was discharged. It awarded the compensatory and punitive damages previously discussed. In all other respects, the jury found for defendants. Judgment was entered on the special verdict, and this appeal followed.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### IV. *The Intentional Infliction of Emotional Distress Issue*

The jury found Bradco had intentionally inflicted emotional distress on Horn, apparently based on the flow of events after the March 3, 1986, encounter when Brady informed Horn that he would accept his resignation effective April 1, 1986. Bradco claims the award is improper, contending workers' compensation provides the exclusive remedy for any distress Horn suffered from the manner of his termination. Horn, however, seeks to avoid the exclusivity rule on two independent grounds. First, he argues workers' compensation does not apply to purely "emotional distress" claims, but provides the exclusive remedy *only* if physical disability results from the emotional distress, citing *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d

---

is not of central import to the issues disputed on appeal. However, it did provide some texture to Horn's claim that he was fired without good cause. The "Ultrawall problem" arose when two of Bradco's longtime managers left the company in early February 1986. Horn learned (approximately one week before being fired) that these former employees were going to be awarded an "Ultrawall" franchise, placing them in direct competition with Bradco on projects using this product. Horn learned this from a Bradco employee, who asked Horn to call the franchiser to prevent the former employees from getting the franchise. Horn refused to intercede, indicating he thought such conduct might be illegal, and immediately confirmed that belief with Bradco's legal counsel.

*See footnote, *ante,* page 653.

833 [147 Cal.Rptr. 447]. Second, Horn claims workers' compensation does not apply where the employer's misconduct is independent of the termination itself.

We conclude, *infra*, that the *Renteria* "exception" to the exclusivity of the workers' compensation remedy has been discounted by subsequent authority and should no longer be followed. As to Horn's second contention, we find no substantial evidence indicating the misconduct of Bradco was independent of the flow of events surrounding Horn's termination, warranting removal of the termination issue from the ambit of workers' compensation. We first review the evidence bearing on the question of independence of the employer's misconduct, then proceed to an analysis of *Renteria*.

### A. Facts

As previously discussed, Brady told Horn on March 3, 1986, that Bradco would accept Horn's resignation effective April 1, 1986, explaining that Horn had not adjusted his values to agree with Bradco's. When given this notice, Horn was shocked and emotionally distraught. However, because Brady had informed Horn that he could proceed with his planned vacation, Horn began vacation on March 13, 1986, returning near the end of March. Upon Horn's return, Bradco's corporate counsel called him, telling him that he needed to decide whether he wished to resign, because without a resignation the corporate records and future references would reflect he was terminated. Horn therefore submitted his first letter of "resignation" dated March 31, 1986, prefacing it with "As requested, I am resigning . . . ."

Shortly thereafter, Brady telephoned and informed Horn that he must delete the "As requested" language because Bradco required an unconditional resignation. He further explained it was Horn's decision whether to resign or be terminated, but without an unconditional resignation Bradco's records would reflect termination. Accordingly, on April 3, Horn submitted a "revised" letter of resignation which omitted the "As requested" language. However, this revised letter was accompanied by an April 3 cover letter in which Horn stated, in part: "I have taken out the references to being requested to resign by [Brady]. My understanding is that you will now be able to state in board minutes that you accepted my resignation instead of entering that I was terminated . . . . [¶] [T]his should or will now allow for positive/proper references . . . ."

Horn's attempt to "qualify" his unqualified resignation (i.e., by submitting an "unqualified" resignation while simultaneously perpetuating the "as requested" proviso in the separate Apr. 3 cover document) met with little enthusiasm. In the final communication on the subject, Brady responded:

"My understanding, by your cover letter dated 4/3/86, is that you desire to be terminated. . . . We will so record in the minutes of the shareholders [and board of directors meetings]. [¶] One-upsmanship is not a game I choose to play in. [¶] If you choose to unconditionally resign (without any games) get it done immediately (4/4/86) or forget it."

Horn had no communications with Bradco regarding the resignation issue after the April 3 letter. However, he did feel compelled to advise prospective employers that Bradco might give him a bad reference (i.e., claim he had been terminated) and to explain the circumstances.

Horn argued to the jury, and contends on appeal, that Bradco's ulterior motive for attempting to extort a voluntary resignation, by threats of poor references, was to get Horn to waive his right to sue the company. He further argued this outrageous conduct was independent of the acts surrounding Horn's termination. The jury was instructed that Horn's recovery required a showing of outrageous conduct independent of his termination. By answers to special interrogatories submitted to them, the jurors found that Bradco *did* intentionally inflict emotional distress on Horn, but, curiously, Brady *did not*. We conclude the evidence is insufficient to place this matter outside the ambit of the workers' compensation scheme and, accordingly, reverse.

### B. *The Emotional Distress Was Directly Related to Conditions of Termination and Therefore Within the Ambit of Workers' Compensation Exclusive Remedy*

 It is now clear that injuries, "whether physical or mental, arising from termination of employment are generally within the coverage of workers' compensation and subject to the exclusive remedy provisions . . . ." (*Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720].) *Shoemaker* reasoned:

"[T]he actions of an employer which constitute a 'normal part of the employment relationship' [*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 (233 Cal.Rptr. 308, 729 P.2d 743)], i.e., risks encompassed within the compensation bargain, are subject to the exclusive remedy provisions . . . . In *Cole*, the employer allegedly falsely accused the employee of misconduct, subjected him to a 'kangaroo' disciplinary proceeding, publicly demoted him, gave him burdensome and menial duties, and even filed an application to force him to retire involuntarily. We held that such actions as demotion, transfer, discipline, and *even the employer's attempt to force the employee into involuntary retirement*, would be included within the ambit of workers' compensation. Nonconsensual termination of an employment rela-

tionship is indistinguishable from the kinds of actions enumerated in *Cole* and must therefore also be considered a normal and inherent part of employment." (*Shoemaker* v. *Myers, supra,* 52 Cal.3d at p. 18, italics added.)

■ Of course, not all conduct is necessarily within the risks inherent in employment relationships. *Shoemaker* recognized some forms of actionable conduct are not within the ambit of the exclusivity rule, stating such forms were "variously identified as 'conduct where the employer or insurer stepped out of their proper roles' [citations], or 'conduct of an employer having a "questionable" relationship to the employment' [citations], *but which may be essentially defined as not stemming from a risk reasonably encompassed within the compensation bargain.* [Citations.]" (52 Cal.3d at p. 16, italics added.)

■ With these general principles in mind, we are unable to discern any substantial evidence that Bradco engaged in any conduct other than that inherent in Horn's termination. Horn cites no conduct apart from the evidence that after Horn was informed of Bradco's decision to terminate him, he discussed with Bradco the *form* such termination would take. While Bradco did inform Horn he could choose which form would be adopted, indicating an involuntary resignation carried negative ramifications for future job references, such discussion cannot be construed as a departure from the proper role of an employer, because it directly pertained to the form by which Bradco and Horn would sever ties and the consequences of that form. We can find no meaningful distinction, nor does Horn suggest one, between an employer's attempt to force an *involuntary* retirement (which *Cole* and *Shoemaker* indicated were within the normal risks associated with the employment relationship) and an employer's effort to force a *voluntary* retirement.

Horn raises two arguments to support his contention that Bradco's actionable conduct was independent of the termination. First, Horn claims the conduct was independent because parts of it occurred *after* Horn's final official day on the payroll.[12] ■ However, the temporal sequence of events is not the conclusive test of whether the injury arose out of the employment relationship. (See, e.g., *Mitchell* v. *Hizer* (1977) 73 Cal.App.3d 499, 507 [140 Cal.Rptr. 790] [terminated employee, injured while returning to job site to retrieve tools, held covered by workers' compensation because

---

[12]Indeed, Horn argues on appeal that *all* of the discussions were independent of the termination because "[t]here was obviously no mention of the resignation issue until Horn had already been fired." The facts, however, show that the precise letter which first informed Horn his employment was ending stated Brady would "accept your resignation effective 4/1/86." Thus, contrary to Horn's claim, it is obvious that Bradco's preference for characterizing Horn's departure as a resignation was expressed at the inception of the discussions.

injury was incident to and within risk of employment]; *Spratley* v. *Winchell Donut House, Inc.*, (1987) 188 Cal.App.3d 1408, 1412 [234 Cal.Rptr. 121] [preemployment conduct can be in course of employment for purposes of workers' compensation].) In *Gates* v. *Trans Video Corp.* (1979) 93 Cal.App.3d 196 [155 Cal.Rptr. 486], an employee was fired after a confrontation with the employer's general manager over compensation disputes. The employee suffered emotional distress from two subsequent confrontations with the general manager. The second confrontation occurred long after the employee had been fired, when the general manager encountered the employee returning to the site to deposit his work keys and gear and retrieve his personal belongings. The court held the employer's actionable conduct during the confrontation was employment-related because it was part of a continuing flow of events surrounding the employee's termination, which encompassed all of the conduct directly related to finalizing the employee's separation from the company. (*Id.* at pp. 203-204.)

In addition to the temporal separation of events, Horn argues the conduct was independent of the termination because it was motivated by Bradco's desire to extract a waiver of Horn's ability to sue for wrongful termination. As a factual matter, we doubt there is *substantial* evidence to support the conclusion that desire for a waiver was in fact the "motivation" behind Bradco's conduct.[13] More importantly, however, Bradco's motivation for its conduct is irrelevant: If the actionable conduct and resulting injury arise from actions normally part of or reasonably incident to the course of the employment relationship, the subjective motivation for the employer's conduct does not remove the injury from the workers' compensation system. (*Cole* v. *Fair Oaks Fire Protection Dist.*, *supra*, 43 Cal.3d at p. 160 [workers' compensation not avoided merely because employer's conduct motivated by "ulterior purpose"].)

 Here, the only evidence of Bradco's conduct giving rise to emotional distress was Bradco's statement that an involuntary resignation could reflect negatively on future job references. However, we perceive an em-

---

[13]While Horn subjectively *believed* a voluntary resignation could operate as a waiver of his right to sue Bradco, he admitted that neither Brady nor Bradco's corporate counsel ever discussed the issue with him. The only "evidence" Horn cites as showing such waiver was Bradco's motivation is a single passage in which Brady was asked on cross-examination if the true motivation for seeking a voluntary resignation was to preempt Horn's suit for wrongful termination, and he replied: "I don't recall. It would not surprise me if that conversation took place with our counsel." We doubt this statement is "substantial evidence," because it neither admits nor denies such preemption was his motivation, but simply states he could not recall one way or the other. While the statement may be a scintilla of proof, substantial evidence "does not mean simply 'any' evidence, [but instead] must actually be 'substantial proof' of the essentials which the law requires in a particular case." (*In re Alcala* (1990) 222 Cal.App.3d 345, 373 [271 Cal.Rptr. 674].)

ployee who is involuntarily terminated must anticipate poor job references as constituting a "risk [ ] . . . [which must] be considered a normal and [an] inherent part of employment." (*Shoemaker* v. *Myers, supra,* 52 Cal.3d at p. 18.) The distress Horn experienced over possible negative references seems no different from the anxiety experienced by *any* employee who is terminated. "Indeed, it would be unusual for an employee *not* to suffer emotional distress as a result of an unfavorable decision by his employer." (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 160.) Because the spectre of poor job references and the anxiety resulting therefrom must be deemed a risk inherent in the compensation bargain, workers' compensation is the exclusive remedy for such injury, and the employer's statements as to future job references, even if ulteriorly motivated, are not outside the compensation bargain.

### C. *Renteria Authority Unpersuasive: Exclusive Remedy for Psychological Injuries Arising from Employment Is Workers' Compensation*

Bradco claims because Horn's emotional distress arose from his employment with Bradco, Horn's sole remedy for such injury is under workers' compensation. ■ It is axiomatic that injuries sustained and arising out of the course of employment are governed by the exclusive remedy provisions of workers' compensation, even though the injuries resulted from intentional conduct of the employer, and even though the employer's conduct might be characterized as egregious and ulteriorly motivated. (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 160.) It appears, at least prima facie, that Horn's emotional distress arose from the events surrounding his termination. ■ The harm to an employee arising from his nonconsensual termination has been held to be within the ambit of workers' compensation as a "normal and inherent part of employment." (*Shoemaker* v. *Myers, supra,* 52 Cal.3d at p. 18.)

■ Horn seeks to avoid the exclusivity rule, contending that his having sought recovery for only emotional distress unaccompanied by physical injury places his claim outside of workers' compensation under the analysis in *Renteria* v. *County of Orange, supra,* 82 Cal.App.3d 833. The *Renteria* court decided that when an employee claims an employer's conduct intentionally inflicts emotional distress but alleges this emotional distress is unaccompanied by *physical* injury or disability, the claim falls outside the exclusivity of workers' compensation. (*Id.* at pp. 840-842.) The court's rationale for this "implied exception" to the exclusivity rule was based on two considerations. First, *Renteria* concluded emotional distress unaccompanied by physical disability was not compensable by workers' compensation, and hence to apply the exclusivity bar would create an "entire class of civil

wrongs" for which there would be no remedy. (*Id.* at p. 841.) Second, the court was concerned that without an available remedy within workers' compensation there would be no deterrent against "extreme and outrageous misconduct by an employer." (*Ibid.*)

After reviewing the authorities which have considered *Renteria*'s "physical versus emotional injury" test in applying the exclusivity rule, we decline to perpetuate the *Renteria* test. This court and numerous other appellate courts have ruled that workers' compensation *is* the exclusive remedy even though the intentionally tortious conduct causes only emotional distress without physical injury. (See *Spratley* v. *Winchell Donut House, Inc., supra,* 188 Cal.App.3d at p. 1414 [rejecting *Renteria* test where employee claimed purely emotional distress based on claim employer fraudulently induced employee to accept employment];[14] see also *Zilmer* v. *Carnation Co.* (1989) 215 Cal.App.3d 29, 35, 40 [263 Cal.Rptr. 422] [employee's claim that employer's "oppressive, fraudulent, malicious, intentional, and deliberate . . . conduct" forced employee to resign and caused emotional distress held within exclusivity rule]; *Pichon* v. *Pacific Gas & Electric Co.* (1989) 212 Cal.App.3d 488, 496-498 [260 Cal.Rptr. 677].)

Indeed, we note the same court which decided *Renteria* has apparently decided the "physical versus emotional injury" distinction should be abandoned. In *Hart* v. *National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420 [235 Cal.Rptr. 68], the employee alleged the employer committed or condoned intentional outrageous and malicious conduct which forced the resignation of the employee, who sued for intentional infliction of emotional distress, among other things. (*Id.* at p. 1425.) The employee's intentional infliction of emotional distress claim sought recovery of patently emotional injuries, although the claim did include "lightly traced" allegations of physical harm. (*McGee* v. *McNally* (1981) 119 Cal.App.3d 891, 894-897 [174 Cal.Rptr. 253.) The *Hart* court therefore reevaluated the *Renteria* distinction, stating:

"[O]ne such factor [justifying an exception to the exclusivity rule] present in intentional infliction of emotional distress cases has unfortunately received more attention than it should have. The factor focuses on whether the employee suffered physical injuries . . . or [only] mental harm . . . . If physical injuries occurred, the courts have held workers' compensation was available . . . and the exclusivity doctrine applied. [Citations.] If the injuries were emotional . . . the courts created an exception to the exclusivity

[14]Horn notes this court cited *Renteria* with apparent approval in *Green* v. *City of Oceanside* (1987) 194 Cal.App.3d 212, 224 [239 Cal.Rptr. 470]. However, *Green*'s citation to *Renteria* was purely dictum since the court concluded the employer had waived the exclusive remedy defense by failing to assert it. (*Ibid.*)

doctrine. [Citing *Renteria.*] [¶] The problems with this approach are twofold. First, '[i]ntentional infliction of emotional distress which results in physical injury and disability is ordinarily more reprehensible than intentional infliction of emotional distress which does not result in disability, [yet] civil action [with its attendant higher awards] is allowed only in the latter situation.' (*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 156.) The second problem deals with the difficulty of handling a case, such as the one before us, where both physical and mental damages have been pleaded. How do we begin to separate them or to decide that one is more significant than the other . . . ? *We believe the time should and has come to cast aside the arbitrary and sometimes irrationally applied 'physical versus emotional harm' approach in favor of another factor more logically connected to the workers' compensation or suit-at-law choice. That factor is whether the acts complained of were a 'normal part of the employment relationship'* (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 160), *or whether the acts were incidents of the employment relationship.* [Citations.]" (*Hart* v. *National Mortgage & Land Co., supra,* 189 Cal.App.3d at pp. 1428-1429, italics added.)

Although *Hart* concluded workers' compensation was not the exclusive remedy in that case, it did so not because of the *Renteria* test, but because the actionable conduct was not a "risk, an incident, [or] a normal part of Hart's employment." (189 Cal.App.3d at p. 1430.) The same court which established the *Renteria* test, and then abandoned it in *Hart,* subsequently revisited the question in *Semore* v. *Pool* (1990) 217 Cal.App.3d 1087 [266 Cal.Rptr. 280]. In *Semore* an employee, fired for refusing to submit to a drug test, sued an employer asserting numerous causes of action, including intentional infliction of emotional distress. (*Id.* at p. 1092.) The plaintiff claimed the exclusivity rule was inapplicable because he sought emotional distress damages without physical injury, and contended the *Renteria* exception therefore controlled. (*Id.* at pp. 1103-1104.) Rejecting this contention, the *Semore* court reaffirmed its adherence to the *Hart* analysis, stating:

"Plaintiff contends that [*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d 148] is inapplicable because he did not allege a physical injury . . . . Defendants reply that all injuries stemming from termination fall under the exclusive remedy provisions of the workers' compensation statutes. . . . [¶] This court has previously held that the proper test is whether the acts alleged were part of the normal employment relationship. [Citing *Hart.*] . . . Applying this test here, we find that the acts complained of were clearly a normal part of the work relationship, and the exclusive remedy provisions of the workers' compensation law apply. (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at pp. 160-161.)" (*Semore* v. *Pool, supra,* 217 Cal.App.3d at p. 1104.)

Thus, we are convinced the majority of courts,[15] including the *Renteria* court, have abandoned *Renteria*'s "physical versus emotional harm" test and instead adopted the *Cole* test, which was reaffirmed in *Shoemaker* v. *Myers*, *supra*, 52 Cal.3d 1, 25. The *Cole* test does not rely on the ephemeral distinctions made in *Renteria*, but instead focuses on whether the actionable conduct (even though alleged to be intentional, unfair or outrageous) is a normal part of the employment relationship. (*Cole* v. *Fair Oaks Fire Protection Dist.*, *supra*, 43 Cal.3d at pp. 159-160.)[16]

We find the reasoning of the above cited cases sufficient basis upon which to discount the *Renteria* precedent. There are other and additional reasons, however, to depart from *Renteria*. A fundamental premise of the *Renteria* analysis is that purely emotional distress is not compensable by workers' compensation, leading *Renteria* to decline application of the exclusivity rule, because it would leave an entire class of injury without a remedy.[17] However, numerous courts have stated that psychological injuries from work-related stress *can* be compensable under workers' compensation. (See, e.g., *City of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 119 Cal.App.3d 355, 365-366 [174 Cal.Rptr. 25]; *Albertson's Inc.* v. *Workers' Comp. Appeals Bd.* (1982) 131 Cal.App.3d 308, 313-314 [182 Cal.Rptr. 304]; see also *Pichon* v. *Pacific Gas & Electric Co.*, *supra*, 212 Cal.App.3d 488, 496-498 [reviewing numerous cases approving compensability of psychological injury caused by stress from job termination].) If the fundamental premise of *Renteria* is flawed, the basis for its exception disappears. We are instructed that *Renteria*'s implied exception to the exclusivity rule "should not be applied where the reason for the exception is not applicable." (*Cole* v. *Fair Oaks Fire Protection Dist.*, *supra*, 43 Cal.3d at p. 157.) The availability of

---

[15]We acknowledge, of course, that the rejection of *Renteria* has not been unanimous. (See, e.g., *Young* v. *Libbey-Owens Ford Co.* (1985) 168 Cal.App.3d 1037, 1042-1043 [214 Cal.Rptr. 400]; *Ankeny* v. *Lockheed Missiles & Space Co.* (1979) 88 Cal.App.3d 531, 535-536 [151 Cal.Rptr. 828].)

[16]Although Horn insists *Cole* cited *Renteria*'s test *with approval*, he concedes that *Cole*'s "approval" was dictum, because *Cole* involved a physical injury and hence the court had no occasion to address the *Renteria* issue directly. Other courts have recognized that *Cole* left open whether *Renteria* is an appropriate standard. (See *Pichon* v. *Pacific Gas & Electric Co.*, *supra*, 212 Cal.App.3d 488, 495.) Similarly, *Shoemaker*'s statement that personal injury is a required precondition to workers' compensation (*Shoemaker*, *supra*, 52 Cal.3d at p. 16) is equally dictum, since *Shoemaker* involved a claimant who alleged that his distress caused physical injury. (*Id.* at p. 25.)

[17]This conclusion is itself somewhat curious, since *Renteria* cited *Williams* v. *Schwartz* (1976) 61 Cal.App.3d 628 [131 Cal.Rptr. 200] for the proposition that a plaintiff's emotional distress, if *negligently* inflicted, *is* subject to the workers' compensation exclusivity rule. (*Renteria*, *supra*, 82 Cal.App.3d at p. 839, fn. 3.) *Williams* involved an emotional distress claim, apparently unaccompanied by any physical injury, and the court concluded the exclusivity rule did apply. (*Williams* v. *Schwartz*, *supra*, 61 Cal.App.3d at pp. 630-634.) If pure emotional distress is a compensable injury, as *Williams* suggests, *Renteria*'s conclusion to the contrary seems inconsistent with the precise authorities it cited.

workers' compensation for psychological injury thus undercuts the vitality of *Renteria*'s exception.

Moreover, the distinctions drawn by *Renteria* create what *Cole* characterized as an "anomaly." (*Cole, supra,* 43 Cal.3d at p. 156.) Under *Renteria,* less egregious conduct (causing only limited distress without physical manifestations) exposes the employer to civil actions with potential for higher awards, while *more* egregious conduct (causing severe distress resulting in physical injuries) brings the employer the protection of workers' compensation with its lower awards. *Renteria* posits a test which is counterproductive to the goal of discouraging intentionally tortious conduct, since employers whose extreme conduct causes physical injuries are held less accountable.

Finally, we perceive *Renteria* as inconsistent with *Cole* in at least two respects. First, application of the exclusivity rule under *Renteria* focuses on the nature of the *injury* suffered, while *Cole* focuses instead on the nature of the actionable *misconduct* giving rise to the injury. Cole asks, was it a normal incident of the employment relationship? (*Cole, supra,* 43 Cal.3d at pp. 159-161.) We, along with other courts (see, e.g., *Hart* v. *National Mortgage & Land Co., supra,* 189 Cal.App.3d 1420, 1429), believe this latter test is more logically related to whether the exclusivity rule should apply.

Second, the *Renteria* test would encourage artful pleading by distressed employees, who, in order to avoid the workers' compensation bar, could simply characterize their injuries as purely emotional and omit any references to physical manifestations. *Cole* rejected an analogous attempt to elevate pleading over substance,[18] and the Supreme Court has recently reaffirmed that "[w]orkers' compensation jurisdiction may not be simply conferred or avoided at the option of the employee." (*Shoemaker* v. *Myers, supra,* 52 Cal.3d at p. 19.) The *Renteria* approach, therefore, is disfavored, since it elevates pleading over substance.[19]

For all of these reasons, we conclude Horn's failure to claim physical injury resulting from the termination does not exempt him from the exclu-

---

[18]In *Cole,* the employee argued the exclusivity rule should not apply when the employer acts unfairly, outrageously and with the intent to cause emotional distress. Rejecting that distinction, *Cole* stated: "If characterization of conduct normally occurring in the workplace as unfair or outrageous were sufficient to avoid the [exclusivity rule], the exception would permit the employee to allege a cause of action in every case . . . merely by alleging an ulterior purpose of causing injury. Such an exception would be contrary to the compensation bargain and unfair to the employer." (*Cole, supra,* 43 Cal.3d at p. 160.)

[19]This case would appear to be representative of the dangers to which we have alluded. Although Horn limited his trial evidence to emotional disquiet, and did not present any evidence of physical injury, his amended complaint alleged he had suffered "emotional distress resulting in physical illness and medical expense," thus illustrating the case with which careful pleading, under *Renteria,* could guide the choice of remedy.

sivity rule. Instead, we focus on whether substantial evidence exists to prove the employer's actionable conduct was either outside of the employer's proper role or of questionable relationship to the employment (*Cole* v. *Fair Oaks Fire Protection Dist.*, *supra*, 43 Cal.3d at p. 161), rather than a normal part of the employment relationship or incident thereto. (*Id.* at p. 160.) Having concluded above there was no substantial evidence that Bradco's conduct exceeded the normal ambit of employer conduct, Horn's claim is relegated to the workers' compensation system.

## DISPOSITION

Insofar as the judgment depends on the jury's answers to special verdict questions numbers 10, 13, 14 and 15, it is reversed. If Horn files his consent to reduction of the judgment, as calculated pursuant to the directions contained in section III.B. of this opinion, within 30 days from the filing of the remittitur in the court below, the judgment, insofar as it is based upon the jury's answer to special verdict question 11, shall be modified and reduced pursuant to those directions. As so modified, the judgment, together with interest from the date of judgment and costs, shall be affirmed. Otherwise, the judgment shall be partially reversed, with directions that Bradco shall be entitled to a new trial upon the sole issue of the amount of damages to be awarded pursuant to special verdict question 11. The remainder of the judgment, insofar as it awards Horn $55,000 as consequential damages pursuant to special verdict question No. 12 and $43,477.28 pursuant to special verdict question No. 8, is affirmed. In that each party has prevailed in this appeal as to some substantial issue raised, each shall bear his or its own costs on appeal.

Huffman, Acting P. J., and Nares, J., concurred.